PER CURIAM
**63 In two separate lawyer discipline matters, the Oregon State Bar charged respondent with violating various Rules of Professional Conduct (RPCs) in her dealings with two different clients, Boyce and Andrach. In the first matter, the Bar alleged that respondent failed to protect Boyce's interests upon terminating her representation of Boyce, RCP 1.16(d), by refusing to surrender documents belonging to the client until her fees were paid. In the second matter, the Bar alleged that, in taking certain actions, respondent assisted Andrach in diverting money from his incapacitated wife's trust account, thereby violating RPC 1.2(c) (assisting client in conduct the lawyer knows to be illegal or fraudulent); RPC 4.1(b) (failing to disclose a material fact when disclosure is necessary to avoid assisting an illegal or fraudulent act by a client; and RPC 8.4(a)(3) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). The Bar also alleged that, in her efforts to obtain the wife's signature on a document giving Andrach power of attorney to manage the wife's financial affairs, respondent violated RCP 4.3 (failing to correct unrepresented person's misunderstanding about a lawyer's role in a matter).
After hearing evidence and argument on the two matters, the trial panel issued a divided decision. A two-member majority concluded that respondent had violated RPC 1.16(d), 1.2(c), 4.3, and 8.4(a)(3), and that the appropriate sanction was disbarment. The single dissenting member opined that the Bar had failed to prove any of the charges and that the complaint should be dismissed. On de novo review, we conclude that the Bar proved a violation of RPC 4.3 (failing to correct unrepresented person's misunderstanding about lawyer's role in a matter) but failed to prove the other charged violations by the requisite clear and convincing evidence standard. We further conclude that the appropriate sanction for the violation of RPC 4.3 is a public reprimand.
I. FACTUAL OVERVIEW
We consider and decide the two matters separately, but before we do so, we provide some general facts that are relevant to both matters. In our analysis of each matter, we **64 discuss those facts and additional facts that we provide at that juncture.
In June 2012, respondent was working for a Bend-area law firm, Bryant, Emerson and Fitch, when a local man, Andrach, sought help from the firm in defending a lawsuit against him and his wife, Wells. The lawsuit had been brought by Exchange Properties, which owned a building that Wells and Andrach had leased for Wells's antique business, and alleged that Wells and Andrach breached their lease. At some point after that lawsuit was filed, Wells was charged with and ultimately convicted of a number of serious crimes in connection with a drunk driving incident, and she absconded to California before she could be sentenced for those crimes. Andrach thus was left to deal with the Exchange Properties litigation on his own.
Wells's absence also left Andrach to manage his wife's self-settled trust, the Wells Trust, which had been the couple's primary source of income over the years of their marriage. Wells was the sole beneficiary of the trust, which owned and generated income from rental properties. Although Wells also was the trustee of the trust, Andrach was identified in the trust documents as her successor trustee: If Wells herself was unable to serve as trustee, Andrach was supposed to *736 step in and manage the trust, but solely for Wells's benefit. Other than that eventuality, Andrach had no legal rights or involvement in Wells's money or property; Wells maintained separate bank and credit accounts, and a prenuptial agreement provided that any property owned or acquired by Wells would remain hers alone.[1] However, in May 2012, before absconding to California, Wells had signed a power of attorney in favor of Andrach, and he used that power of attorney to pay the trust's expenses out of Wells's bank and credit accounts.
That is how matters stood in June 2012, when Andrach sought help from respondent's law firm in the Exchange Properties litigation. Respondent did not work on the Exchange Properties litigation, which was handled by **65 one of the firm's named partners, Bryant.[2] However, respondent did agree to represent Andrach in a separate matter-a petition to have his personal debts discharged in Chapter 7 bankruptcy.[3]
While Andrach's bankruptcy petition was pending, respondent left the Bryant, Emerson and Fitch firm and set up as a sole practitioner. Respondent shared office space with Boyce, a woman who previously had worked at Bryant, Emerson and Fitch as a paralegal.[4] In the early days of that office-sharing arrangement, Boyce sought respondent's assistance in a legal matter relating to the care that her parents had received at a nursing home, and respondent agreed to look into the matter. Boyce gave respondent a binder of documents that she thought were relevant to the matter, and respondent and her legal assistant, Nichols, started to research possible claims.
In August 2012, Wells returned to Oregon and immediately instructed her bank that she would resume control of her accounts. Soon thereafter, however, she was arrested and jailed in connection with her criminal convictions. Perhaps believing that Wells's instructions to her bank had affected the power of attorney that Wells had granted him in May 2012, Andrach retained respondent to obtain a new power of attorney from Wells. After multiple visits to Wells at the jail, respondent succeeded in obtaining Wells's signature on a document, dated September 19, 2012, naming Andrach as her attorney-in-fact.
Wells had a long history of mental illness and substance abuse and, while in jail awaiting sentencing, had **66 appeared to be incapable of making rational decisions about the Exchange Properties litigation or her own health. On September 27, 2012, Andrach filed a petition for appointment of a guardian for Wells. A circuit court judge granted that petition on November 1, 2012, declaring Wells to be incapacitated and naming a longtime friend of Wells, Defoe, as temporary guardian and guardian ad litem in the Exchange Properties litigation.[5] Upon the court's declaration of Wells's incapacity, Andrach understood that he had succeeded to the role of trustee under the terms of the Wells Trust. Thus, as of November 1, 2012, Andrach was holding himself out as both the trustee of the Wells Trust and Wells's attorney-in-fact under the power-of-attorney document *737 that he had obtained in September 2012.
In November 2012, Andrach and respondent became involved in an intimate relationship. By March 2013, respondent was pregnant with Andrach's child. On March 5, 2013, respondent filed articles of incorporation to form a company, TLA Properties LLC, identifying herself and Andrach as the only members. On April 1, 2013, TLA Properties purchased a house, which became respondent's and Andrach's shared residence. Andrach contributed $65,000 to the $80,000 down payment. The $65,000 apparently came out of a $100,000 check that Andrach's mother-in-law (and Wells's mother), Robertson, had sent to Andrach the preceding Christmas, along with instructions to spend it on Wells's legal fees and the mortgage and property taxes on a house that Wells had purchased in California.
In the meantime, Defoe had resigned as Wells's temporary guardian and guardian ad litem , and Andrach petitioned the court to have respondent's officemate, Boyce, appointed to replace Defoe on a permanent basis (Wells, by that point, was serving the prison sentence that had been imposed for her criminal convictions). On March 22, 2013, the court issued a stipulated order appointing Boyce as Wells's permanent guardian ad litem (but not as her **67 guardian).[6] Boyce thereafter undertook to make decisions on Wells's behalf in the Exchange Properties litigation and also, apparently, in some additional financial matters. Andrach continued to serve as Wells's successor trustee and attorney-in-fact.
At around that time, Andrach was considering divorcing Wells and had decided to seek reimbursement from the Wells Trust for money that he claimed to have expended in the preceding months in support of Wells and management of the trust. As Wells's purported guardian, Boyce apparently agreed that Andrach should be repaid the sum of $53,000 and that that payment should be made by selling a property in the Wells Trust portfolio.[7] Respondent drafted a promissory note from the Wells Trust to Andrach for $53,000 and a trust deed in Andrach's favor on the trust property. However, before the contemplated sale could occur, Boyce had a falling-out with Andrach and respondent.
One result of that falling out was that respondent terminated her representation of Boyce in the contemplated action against the nursing home. After receiving notice that respondent had decided to end her involvement in the nursing home matter, Boyce sought return of the binder of documents that she had given to respondent. Respondent refused to return the binder, asserting that, under ORS 87.430,[8] she had a lien on the documents to secure Boyce's payment of her fees for the work she had performed on the case. Boyce denied that any fees were owed and brought an action against respondent alleging conversion and other claims. Boyce also complained to the Bar about respondent's retention of the binder, and the Bar opened an investigation into the matter. Ultimately, the Bar filed a formal complaint charging respondent with violating RPC 1.16(d) by failing, upon termination of representation of a client, to surrender papers and property to which the client was entitled.
**68 Another result of the falling-out was that Boyce sought to oust Andrach from his positions as Wells's successor trustee and attorney-in-fact, first by obtaining documents from Wells naming Boyce to those positions in Andrach's stead, and later by assisting Wells's sister, Jordan, in Jordan's efforts to replace Andrach. Boyce also sought to distance herself from the contemplated sale of trust property to reimburse Andrach for the $53,000 in expenditures and suggested to Jordan that Andrach's actions in that matter were fraudulent. Andrach eventually ceded his authorities as trustee and attorney-in-fact to Jordan, but, before he did so, he wrote a check for $9,500 on Wells's line of credit and *738 revised a lease with a tenant of Wells's so that Andrach, rather than Wells, was named as the lessor.
Wells and Jordan considered Andrach's actions to be fraudulent, and their concerns had a number of repercussions. Wells filed for dissolution of her marriage to Andrach, and Andrach's alleged fraud was an issue in that proceeding.[9] However, a settlement was reached, and no determination of fraud was ever made. Second, Jordan, her lawyer, and Wells's dissolution lawyers all filed Bar complaints against respondent, alleging that respondent had assisted Andrach in his purportedly fraudulent acts. After an investigation, the Bar charged respondent in a formal complaint with violating RPC 4.3 (failing to clarify lawyer's role to unrepresented person) in her dealings with Wells regarding the power of attorney and with violating RPC 1.2(c) (assisting client in conduct that lawyer knows is illegal or fraudulent), RPC 4.1(b) (failing to disclose material fact when doing so is necessary to avoid assisting client in fraud), and RPC 8.4 (a)(3) (engaging in conduct involving dishonesty, fraud, deceit or representation) in various actions on Andrach's behalf. The Wells/Andrach matter and the Boyce matter were tried together.
**69 II. THE TRIAL PANEL DECISION AND THE PARTIES' ARGUMENTS
As noted, the trial panel issued a split decision. In the Boyce matter, a majority of the panel opined that Boyce and respondent had never reached any agreement about fees and that, in the absence of such an agreement, respondent was owed no money and had no basis under ORS 87.430 for withholding Boyce's documents. Because respondent had no lawful basis for withholding Boyce's documents, the majority concluded, respondent necessarily violated RPC 1.16(d) when she did so. The majority rejected respondent's contention that she had a lien on the papers for purposes of ORS 87.430 based on money that Boyce owed her on a quantum meruit theory, finding that there was no evidence of what the fair value of her work might have been-a necessary component of a quantum meruit claim.
In the Wells/Andrach matter, the majority first concluded that respondent had violated RPC 4.3 (engaging in improper communication with a person who is not represented by counsel) while attempting to obtain a power of attorney for Andrach from Wells. The majority then concluded that respondent had violated RPC 1.2(c) (assisting a client in conduct that the lawyer knows is illegal or fraudulent) by preparing the promissory note and trust deed that Andrach had attempted to enforce against property in the Wells Trust, defending the $9,500 check that Andrach had written on Wells's line of credit, and assisting him by drafting a lease revision that effectively directed a tenant's monthly rents to Andrach, rather than Wells. Finally, the majority found that respondent had violated RPC 8.4(a)(3)[10] (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation) by "assisting Andrach in draining and attempting to drain Wells's individual assets and trust assets"-referring, again, to respondent's conduct with regard to the trust deed, the $9,500 check, and the lease. The majority recommended that respondent be disbarred.
**70 The dissenting member of the trial panel concluded that respondent had not committed of any of the charged disciplinary violations. In the Boyce matter, he concluded that respondent was entitled to be compensated for her work under a quantum meruit theory and therefore was entitled to retain Boyce's papers under ORS 87.430. In the Wells/ Andrach matter, the dissent first opined that respondent had not violated RPC 4.3 in her attempts to obtain a power of attorney from Wells because the evidence *739 before the trial panel would not permit a finding that respondent had misled Wells or given her legal advice. As to the remaining charges in the Wells/Andrach complaint, the dissent emphasized that the Bar was required to show that respondent had knowledge that her own actions or those of her client were fraudulent or illegal, and must do so by the applicable clear and convincing evidence standard. The dissent asserted that the Bar had not met that standard.
On review, respondent focuses on the majority opinion, challenging each of its determinations of violation on the ground that it was not supported by the evidence before the trial panel. With respect to some of the majority's determinations of violation, respondent also argues that the determination was erroneous because it was based on facts and theories that were not pleaded by the Bar. The Bar generally argues that it properly pleaded and proved each of the violations identified by the majority.
III. ANALYSIS
In light of the sparsity of detailed factual findings and analysis in the trial panel opinions and the panel's failure to reach unanimity, we choose not to focus, as respondent does, on the majority opinion. We consider the allegations in the Bar's complaint and determine on de novo review whether the Bar proved those allegations by clear and convincing evidence. ORS 9.536(2) ; BR 10.6. In weighing the parties' arguments on those matters, we remain mindful that the Bar's complaint must sufficiently allege the conduct that constitutes any violation that is found. See, e.g. , In re Ellis/Rosenbaum , 356 Or. 691, 738-39, 344 P.3d 425 (2015) (so stating);
**71 In re Magar , 296 Or. 799, 806 n. 3, 681 P.2d 93 1984) (same); In re Lasswell , 296 Or. 121, 128, 673 P.2d 855 (1983) (same); see also BR 4.1(c) (Bar's complaint must "set forth succinctly the acts or omissions of [respondent] * * * so as to enable [respondent] to know the nature of the charge or charges against [respondent].").
A. The Boyce Matter
In the Boyce matter, the Bar charged respondent with violating RPC 1.16(d) by refusing to return documents belonging to her officemate, Boyce, upon ending her representation of Boyce. The following additional facts are relevant to that charge.
In November 2012, Boyce asked respondent to attend a meeting that she had scheduled with representatives of the nursing home where her mother had died regarding her mother's treatment at the facility. Respondent agreed to attend the meeting and to investigate potential claims that Boyce might have against the nursing home. Respondent and Boyce did not then or at any time thereafter enter into a written fee agreement, and there does not appear to have been any clear meeting of the minds on the issue of how respondent would be paid. Boyce insisted that there was an agreement that respondent would be paid only on a contingency basis; respondent countered that there was an initial understanding that she would be paid on an hourly basis for preliminary work and a subsequent discussion of some kind of hybrid contingency/hours-based arrangement, but never any agreement as to specific terms.
After the meeting, Boyce provided respondent with a large binder that contained both her parents' medical and nursing home records. Over the next five months, respondent spent some 20 hours reviewing the records in the binder, performing legal research, and outlining potential claims against the nursing home, including a wrongful death claim. She kept records of the hours that she and her assistant, Nichols, spent on the case and directed her bookkeeper, Fryer, to send monthly invoices that reflected those hours, as well as her hourly rate, to Boyce. Fryer believed that respondent had taken the case on a contingency basis and had a notation in her files to that effect.
**72 In May 2013, Boyce and respondent had a falling out and, on May 30, 2013, respondent terminated her representation of Boyce by letter. In the letter, respondent instructed Boyce that she could pick up the records that she had supplied to respondent for review (i.e. , the large binder) at her convenience. However, in a second letter to Boyce, respondent stated that she would release the binder *740 only after Boyce paid her attorney fees. The letter stated that the fees owed by Boyce amounted to $4,252.50, an amount that was explained in an enclosed invoice that showed the hours that respondent had worked on the case at her hourly rate of $225. But the letter also contained a statement: "As you know, I had undertaken representation on a contingency fee basis."
Boyce hired a new attorney to represent her in her contemplated action against the nursing home who wrote to respondent on Boyce's behalf, stating that the records were needed for the nursing home litigation and demanding their return. Respondent insisted, however, that, under ORS 87.430, she had a valid attorney fee lien on the binder for the work that she had performed and would not return the binder until the lien was satisfied. In September 2013, Boyce filed a Bar complaint about respondent's retention of the binder, and the Bar opened an investigation into the matter. At around the same time, Boyce brought an action against respondent alleging conversion and other claims, and respondent counterclaimed, seeking reimbursement for the time that she had spent on Boyce's case and for Boyce's share of the rent on their office, which Boyce had precipitously abandoned. The parties apparently settled those claims, with Boyce paying respondent $10,000, and respondent returning Boyce's records. After completing the investigation that had been triggered by Boyce's complaint, the Bar filed a formal complaint charging respondent with violating RPC 1.16(d) by failing, upon termination of representation of a client, to surrender papers and property to which the client was entitled.
RPC 1.16(d) provides:
"Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect **73 a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers, personal property and money of the client to the extent permitted by other law ."
(Emphasis added.) The "other law" that might justify respondent's retention of Boyce's binder in this case is ORS 87.430, which provides:
"An attorney has a lien for compensation whether specially agreed upon or implied, upon all papers, personal property and money of the client for services rendered to the client. The attorney may retain the papers, personal property and money until the lien created by this section, and the claim based thereon, is satisfied, and the attorney may apply the money retained to the satisfaction of the lien and claim."
Although the Bar made other arguments to the trial panel with regard to this asserted violation,[11] the primary issue before this court is whether respondent had a legitimate lien for attorney fees under ORS 87.430 that justified her retention of Boyce's binder of records. With regard to that issue, the Bar alleged that respondent had agreed to represent Boyce on a contingent fee basis but did not obtain a written fee agreement. The Bar further alleged that, upon terminating her representation of Boyce, respondent had confirmed the contingency arrangement but then announced that she was asserting a lien on the records based on the hours that she spent on the case at her hourly rate. Finally, the Bar alleged that, under the described circumstances, respondent had no right to assert a lien and, therefore, no justification for refusing to return Boyce's records as required by RPC 1.16(d).
In response to those allegations, respondent sought to prove that, although she and Boyce had never reached any **74 clear agreement about her fees, Boyce had understood that respondent expected to be paid for her time and that respondent had rendered services to Boyce that had value. Under those circumstances, respondent argued, she could *741 assert a lien for the reasonable value of her services under a quantum meruit theory. The Bar argued, and continues to argue, that quantum meruit is not a proper basis for asserting a lien under ORS 87.430 and that, in any event, the evidence in the record is insufficient to support a right to fees on a quantum meruit theory.
The evidence as a whole does not support the Bar's allegation that respondent and Boyce entered into of a contingency fee agreement, written or oral. Although Boyce testified that respondent agreed to represent her on a contingent basis and the evidence shows that respondent mentioned a contingency fee arrangement in her termination letter to Boyce and that respondent's bookkeeper made a note in her records of Boyce's account about a contingency fee arrangement, there is no evidence that the parties reached agreement on the terms of such an arrangement. It appears, instead, that a contingency fee agreement was discussed but never finalized. By the same token, there is no evidence that the parties reached an agreement that respondent would be paid on an hourly basis or at the $225 rate that respondent billed Boyce. It is clear, however, that Boyce asked respondent to help her with her case, that respondent performed some work, and that Boyce received the benefit of that work.
Respondent contends that those facts entitle her to reasonable compensation under a quantum meruit theory and that, under ORS 87.430, if she is entitled to compensation, she is entitled to a lien. Accordingly, we must consider whether respondent was entitled to compensation from Boyce, based on the reasonable value of the services that she performed. As explained in commentary to section 31 of the Restatement (Third) of Restitution and Unjust Enrichment (2011),[12] a quantum meruit claim "typically seeks **75 compensation for services rendered in the expectation of payment, but in the absence of explicit agreement as to amount." Restatement (Third) of Restitution and Unjust Enrichment § 31 comment e (2011). Depending on the circumstances, a quantum meruit claim may proceed on one of two theories. In appropriate cases, a court may find that the person receiving the services impliedly promised to compensate the person providing the services at the customary or "going rate" for such services. In those cases, in which the promise to pay is "implied in fact," the action retains a contractual character. Id. In other cases, the court may be unable to find an implied promise to pay but will impose an obligation to pay a reasonable price on a party who has requested and received the services of another, "as necessary to prevent unjust enrichment." Id. Although those latter cases are quasi-contractual rather than contractual in character, they generally are described in terms of an implied contract, albeit one that is "implied in law." Judy Beckner Sloan, Quantum Meruit Residual Equity in Law , 42 DePaul L. Rev. 399, 407-08 (1992).
This court has recognized that distinction between contracts that are "implied in law" and contracts "implied in fact." Larisa's Home Care, LLC v. Nichols-Shields , 362 Or. 115, 128-129 n. 5, 404 P.3d 912 (2017). It is an agreement that is "implied in fact" that is at issue here. Persons who request services from another may be liable on a quantum meruit basis for the reasonable value of those services, based on an implied promise to pay for those services. See, e.g. , Bastian v. Henderson , 277 Or. 539, 545, 561 P.2d 595 (1977) ("[O]ne who requests another to provide beneficial work, labor and materials impliedly promises to pay the reasonable value of such work, labor and materials."); Cronn v. Fisher , 245 Or. 407, 416, 422 P.2d 276 (1966) (where one person requests that another person perform beneficial services for him, the law, in the absence of any express contract, will "imply a promise * * * to pay for [those services] what they were reasonably worth"); McKee v. Capitol Dairies , 164 Or. 1, 7, 99 P.2d 1013 (1940) (same). Respondent's work for Boyce would seem to fall within the rule, as articulated in those cases: The evidence shows that Boyce requested *742 respondent's services and that, although there was no clear agreement with **76 regard to her fees, respondent performed the requested services.
The Bar contends that, assuming that respondent had a claim for attorney fees from Boyce based on a quantum meruit theory, she could not assert a lien under ORS 87.430 against Boyce's documents on the basis of that claim. That is so, the Bar argues, because ORS 87.430 applies when there is either an express or implied agreement for payment, and quantum meruit -based claims are not grounded in an agreement but, instead, on a right to restitution to prevent unjust enrichment. The Bar does not argue that an implied in fact promise to pay is insufficient to permit a lien under ORS 87.430 and conclude that a lawyer who demonstrates an implied promise to pay the reasonable value of services rendered may assert a right to a lien under ORS 87.430.
The Bar argues that, even if, in theory, an attorney may assert a lien for attorney fees under ORS 87.430 based on quantum meruit , respondent had no legitimate basis for doing so here because she did not perform services that actually conferred a benefit on Boyce. In support of that argument, the Bar points to respondent's testimony that she "did very little work [on Boyce's case] at the outset" and that she did not "really analyze[ ] the wrongful death claim." The Bar also notes that, although respondent invoiced Boyce for working on drafting a complaint, she apparently did not produce a complaint. But, in fact, there is substantial evidence that respondent did perform services that benefitted Boyce: (1) exhibits showing monthly invoices that respondent directed to Boyce, which detailed the hours that she had spent "outlin[ing] claims," "review[ing] rules and regulations," "draft[ing a] complaint," "review [ing] medical records," and "research[ing] elder abuse," all to advance Boyce's case against the nursing home; (2) testimony by respondent about attending a meeting with nursing home representatives, reviewing Boyce's parents' records and the relevant law to determine if Boyce had any claims against the nursing home, and beginning to draft a complaint; and (3) Boyce's own testimony that respondent had attended a meeting with the nursing home's representatives and had discussed the merits of potential claims against the nursing home with her-discussions that Boyce acknowledged **77 "g[a]ve [her] value." Considering the totality of the evidence, we conclude that the legal services for which respondent claimed a right to compensation in fact did benefit Boyce. Although there may be grounds to dispute the amount that respondent claimed as reasonable compensation, the issue here is only whether she had some right to reasonable compensation that would justify her assertion of a lien on Boyce's papers and property under ORS 87.430. We conclude that respondent did have such a right.[13] Because her retention of Boyce's records was permitted under "other law," i.e. , ORS 87.430, that conduct did not violate RCP 1.16(d).
B. The Wells/Andrach Matter
1. RPC 4.3 -Improper communication with unrepresented person
The Bar charged respondent with violating RPC 4.3 in her dealings with Wells while attempting to obtain a power of attorney for Andrach. The additional evidence that is relevant to that charge shows that, in pursuit of the power of attorney that Andrach asked her to obtain, respondent visited Wells at the jail on three separate occasions. On September 14, 2012, she and Boock, a notary, met with Wells in the attorney-client conference room at the jail. Respondent told Wells that she was there "because your husband asked me to have you sign a [power of attorney] for him." Wells became agitated and refused to sign, remarking, "I know who you are. * * * I didn't ask for it [;] my husband did." Wells then raised the issue of a $66,000 check that had been written on one of her bank accounts to her mother, Robertson. Wells wanted to stop payment on the *743 check. Respondent drafted some form of handwritten stop payment notice on her legal pad and gave it to Wells to sign and then to Boock to notarize. Before she left the jail, respondent gave her phone number and the power-of-attorney form to Wells, and told her to call if she had any questions. Boock apparently believed throughout the interaction that **78 Wells was respondent's client, having identified Wells in her notary log as "client of Lisa Klemp."
After leaving the jail, respondent contacted Andrach and told him about Wells's request to stop payment on the $66,000 check. Andrach told respondent that he already had sent the check to Robertson, that the money was to repay a loan that Robertson made to Wells, and that Robertson would be unhappy if payment on the check were stopped. Respondent also inquired at the bank as to whether a document like the one that Wells had signed might be effective to stop payment of a check and learned that it would not.
A few days later, Wells telephoned respondent and told her that she was ready to sign the power of attorney.[14] Respondent went to the jail, again accompanied by Boock, on September 17, 2012. There, she learned that Wells already had signed the power-of-attorney form that respondent had left with her. Respondent asked Wells a series of questions to establish her competency to sign the power of attorney document. When respondent asked Wells if she had signed the document under duress, Wells responded that, in fact, she had. When pressed, she repeated her assertion that the power of attorney had been signed under duress. Boock wrote in her notary log that the power of attorney was "voided, signed under duress," and she and respondent left the jail, taking the signed power-of-attorney document with them.
On September 19, 2012, Wells again telephoned respondent to tell her that she would sign the power of attorney. For a third time, respondent and Boock met with Wells at the jail, and this time the interaction was uneventful: Wells signed the power of attorney and answered all the competency questions appropriately. The signed power of attorney gave Andrach authority to "receive, endorse, sign, sell, discount, deliver, and deposit checks, drafts, notes and negotiable instruments" on Wells's behalf. It also granted Andrach authority to "resign from or renounce on my behalf **79 fiduciary positions, including * * * trustee." Respondent immediately sent the signed and seemingly valid power of attorney to Andrach, but he, perhaps inadvertently, recorded the September 17, 2012, document, which respondent had deemed to be void, instead.[15]
RPC 4.3 provides:
"In dealing on behalf of a client * * * with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel, if the lawyer knows or reasonably should know that the interests of such a person are or have a reasonable possibility of being in conflict with the interests of the client or the lawyer's own interests."
Each of the three sentences in RPC 4.3 sets out a distinct act or omission that may constitute a violation when a lawyer is dealing on behalf of a client with a person who is not represented: (1) stating or implying disinterestedness; (2) failing to make reasonable efforts to correct a misunderstanding about the lawyer's role; and (3) giving legal advice, other than the advice to secure counsel, if the *744 person's interests might be in conflict with those of the lawyer's client.
In its formal complaint, the Bar alleged that, insofar as Wells was not represented in civil matters and was confused about respondent's role in the power of attorney matter, respondent violated RPC 4.3 by failing to make reasonable efforts to correct the misunderstanding. That allegation clearly refers to the conduct described in the second sentence of RPC 4.3. The complaint further alleged that respondent failed to advise Wells that she should seek the advice of her own counsel before signing the power of attorney, an allegation that arguably could refer generally to the third type of conduct described in the rule-giving **80 legal advice, other than advice to secure counsel. However, in the absence of any allegation specifically identifying conduct that constituted the giving of legal advice, that theory of violation is not sufficiently alleged.[16] We therefore confine our analysis to the theory that was clearly alleged-that respondent violated the rule by failing to take reasonable steps to correct what she knew or should have known was a misunderstanding about her role. To establish that respondent violated RPC 4.3 under that theory, the Bar had to prove that (1) Wells was unrepresented in the power of attorney matter; (2) respondent knew or should have known that Wells misunderstood her role; and (3) respondent failed to take reasonable steps to correct the misunderstanding.
There is no significant dispute about the first requirement: Wells had attorneys who were defending her in her criminal cases and in the Exchange Properties litigation, but no one was representing her with respect to her general financial transactions or, specifically, the granting of a power of attorney.
As to the question whether respondent knew or should have known that Wells misunderstood her role, i.e. , who respondent was representing, the evidence clearly and convincingly shows that the answer is "yes." Although respondent contends that any suggestion that Wells misunderstood is undermined by evidence that she told Wells that she was there to obtain a power of attorney for Andrach , and by Wells's response-"I know who you are. * * * I didn't ask for it[;] my husband did"-that evidence does not negate the possibility that Wells believed that respondent was working for both Andrach and herself. In fact, it would be very natural to think that way, particularly if-as Boock stated in a memorandum setting out her recollection of the event written three days later-respondent "advised Wells what the Durable Power of Attorney was for and what it allowed her husband to do with her funds, such as pay the bills and **81 mortgage and handle any other bills that came up regarding her estate." Respondent should have known that Wells reasonably would hear that explanation as assurance that the power of attorney was for her benefit, which would suggest to her that respondent was working for her as well as for Andrach.
And there is other evidence to that same effect. The fact that Wells asked for respondent's phone number could have suggested to respondent that Wells was relying on her counsel in the power of attorney matter. More importantly, the fact that Wells sought (and seemingly obtained) respondent's assistance in dealing with her concerns about the $66,000 check to Robertson-an issue that evidently was connected, in Wells's mind, with her husband's authority to use her bank accounts[17] -should have alerted respondent that Wells saw her as a legal resource for her in the matter. The foregoing is clear and convincing evidence that respondent reasonably should have known that Wells believed that respondent represented Wells as well as Andrach.
*745 We turn, then, to the evidence regarding "reasonable efforts" by respondent to correct that misunderstanding. RPC 4.3. There is no evidence that respondent explicitly warned Wells that she was not her lawyer and could not be depended on to represent Wells's interests in the power of attorney matter. There is some evidence-specifically, respondent's own testimony-that respondent told Wells, at the first meeting in the jail, that she should call an attorney if she had any questions and that, if no one was representing her with regard to her money matters, she could ask her criminal lawyer for the number of the Oregon State Bar attorney referral service. That evidence is not undisputed: Boock, the only other living witness to respondent's interactions with Wells,[18] was questioned repeatedly about whether respondent had told Wells to have another attorney review the power of attorney before she signed it, and Boock consistently answered "no."
**82 But resolving that conflict is not consequential in this context. Assuming that respondent did tell Wells about the Bar's attorney referral service and to contact another attorney if she had questions, those admonitions would not constitute "reasonable efforts" to correct Wells's apparent misapprehension that respondent was representing Wells and her husband as a couple in the power-of-attorney matter. While a person with a sophisticated understanding of lawyerly duties might understand a lawyer's admonition to talk to another lawyer in those circumstances as a renunciation of any responsibility for the person's legal interests, respondent had no reason to believe that Wells had that level of sophistication. Respondent also knew that Wells was mentally unstable, a circumstance that would suggest that more pointed warnings would be required to convey the message that Wells needed to hear.
The evidence clearly and convincingly shows that respondent reasonably should have known that Wells erroneously believed that she was, in some respect, working on Wells's behalf and that respondent failed to take steps that were reasonably calculated to disabuse her of that belief. In short, the Bar proved its allegation that respondent violated RPC 4.3 by failing to clear up an unrepresented person's misunderstanding about her role.
2. RPC 1.2(c) -Assisting a Client in Illegal or Fraudulent Conduct
RPC 1.2(c) provides that a lawyer "shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is illegal or fraudulent [.]" In its complaint, the Bar alleged that, in a number of different incidents, respondent assisted her client, Andrach, in his efforts to fraudulently or illegally appropriate money belonging to Wells or the Wells Trust. Although the Bar has abandoned some of those claims, four incidents are still in contention. Before turning to those four incidents, we pause to note that the Bar's burden in proving these claims was particularly difficult to meet in light of several circumstances. First, to prove that respondent knowingly assisted Andrach in illegal or fraudulent conduct, the Bar first had to prove that Andrach's conduct was, in fact, illegal or **83 fraudulent.[19] No court had made that determination, so the Bar had to adduce that evidence in this proceeding. Second, the circumstances were such that it was particularly difficult for the Bar to prove both that Andrach's conduct was fraudulent or illegal, and that respondent knew that when she assisted. Wells and Andrach, two persons who presumably had knowledge about money due to Andrach and whether Andrach acted fraudulently in seeking repayment, were not available to testify in the Bar proceeding: Wells was arguably too incapacitated to provide testimony and, in any event, died before the trial. Andrach had left the area by that time; only his deposition testimony in the dissolution proceeding was available to the trial panel.[20] *746 With that preamble, we turn to the incidents that the Bar alleged.
a. The Robertson check
Although this charge was rejected by both the trial panel majority and dissent, the Bar continues to argue that Andrach fraudulently signed Wells's name to a $66,000 check to Robertson and that respondent knowingly assisted Andrach in perpetrating that fraud by seeking a power of attorney from Wells that would ensure that the check would go through in spite of Wells's opposition. Most of the facts that are relevant to this charge already have been set out above, in our discussion of the charged violation of RPC 4.3. 363 Or. at ----, 418 P.3d at ----.
To establish a violation of RPC 1.2(c) on this theory, the Bar had to prove, among other things, that Andrach signed Wells's name to the check. The Bar failed to do so. In fact, the evidence strongly supports a conclusion that Wells herself signed the check, but regretted having done so and cast about for some way to prevent the check from going through. Respondent testified that that was what Wells conveyed when she brought up the check as the reason that she **84 did not want to sign the power of attorney. After reviewing her own memorandum of the visits with Wells at the jail, Boock confirmed that Wells had acknowledged writing the check herself and wanting to have payment stopped. Against that strong and consistent evidence that Wells had signed the check, the Bar points to circumstantial evidence to the contrary-that Andrach had signed Wells's name to other checks and that her criminal lawyer, who had brought Wells other checks to be signed, did not recall bringing her a $66,000 check for Robertson. Given the lack of clear and convincing evidence that Andrach signed the check in Wells's name, the Bar failed to prove that respondent knowingly assisted Andrach in perpetrating a fraud in connection with the Robertson check.
b. The trust deed
The Bar alleged that respondent knowingly assisted Andrach in his attempt to collect a fraudulent debt from the Wells Trust. It alleged, specifically, that (1) Andrach acted fraudulently when, purporting to act as trustee of the Wells Trust, he executed a $53,000 promissory note from the trust to himself, along with a trust deed granting himself a lien on certain trust property to secure that promissory note; (2) respondent had assisted in that fraud by preparing the promissory note and trust deed and recording those documents after they were executed; and (3) at the time when she assisted Andrach with the promissory note and trust deed, respondent knew that Andrach was not owed $53,000 by the trust and that the promissory note and trust deed therefore were fraudulent. The additional facts that are relevant to those allegations are set out below.
By late March 2013, Boyce had been appointed Wells's guardian ad litem and was holding herself out as authorized to make certain decisions on Wells's behalf, while Andrach retained his authority to manage the Wells Trust. At that time, Boyce and Andrach apparently agreed that Andrach had expended money from his own funds in support of Wells and her trust, and should be repaid for those expenditures. Together, Boyce and Andrach examined checks, receipts, and other evidence that Andrach provided, and they created a ledger that showed the various **85 debts that they claimed the Wells Trust owed to Andrach. Based on that ledger, they apparently agreed that the trust should issue a $53,000 promissory note to Andrach, to be secured by a trust deed against one of the trust properties. At Andrach's and Boyce's request, and after examining the ledger and supporting material that Andrach and Boyce had compiled, respondent drafted the contemplated promissory note and trust deed. But, recognizing that Boyce, as Wells's guardian, and Andrach, as successor trustee of the Wells Trust, might be viewed as having conflicting interests, respondent had them both sign a letter waiving *747 any potential conflict that she might have in representing both of them in the matter.[21]
Boyce and Andrach did not immediately execute the trust deed, because that would have violated a temporary restraining order issued in the Exchange Properties litigation prohibiting Wells and her agents from encumbering any of the property held by the Wells Trust during the pendency of the litigation. However, when the Exchange Properties trial began in early April 2013, Boyce asked the court to modify the temporary restraining order to allow for certain expenditures and encumbrances. When Boyce informed Andrach and respondent that the court had granted her request, Andrach, in his capacity as trustee of the Wells Trust, immediately executed and recorded the trust deed that respondent had prepared and started the process of selling the encumbered property. Exchange Properties later attacked the trust deed as a violation of the modified temporary restraining order, and Andrach eventually withdrew it.
**86 The Bar contends that Andrach's claim that the trust owed him $53,000 was false and that respondent knew that it was false at the time that she prepared the promissory note and trust deed. The Bar relies on three strands of evidence to prove those facts.
First, it points to the ledger and supporting documentation that Andrach and Boyce compiled to substantiate the trust's $53,000 debt to Andrach, which were entered as exhibits by respondent. The ledger and supporting documentation purported to show every expenditure that Andrach had made for the benefit of Wells and her trust, totaling $53,000. The Bar contends that Andrach made those expenditures for his own benefit and that, if respondent had reviewed the documents before drafting the promissory note and trust deed, which she had an ethical duty to do and which she testified to having done, then she must have known that the claimed expenditures were for Andrach's own benefit and not for Wells's. The Bar asserts that "many" of the items and expenditures were self-evidently not for the benefit of Wells or her trust.
We disagree with the Bar's characterization of the expenditures itemized in the ledger. The majority of those expenditures were, by their nature, unquestionably for the benefit of Wells and her trust properties. A few, which otherwise would have been questionable, were accompanied by a notation that Wells's "guardian" had approved reimbursement of the expense on Wells's behalf.[22] As it turns out, the "guardian" referenced in the ledgers, Boyce, was not Wells's guardian, but merely her guardian ad litem in the Exchange Properties litigation. But respondent testified that Boyce had represented that she was Wells's guardian and that she had relied on that representation and on the fact that Boyce, an expert in probate matters, had worked closely with Andrach in compiling the ledgers. The Bar insists that respondent had no actual, legal basis for relying on Boyce's judgment because Boyce was not a lawyer and because, even if Boyce had been Wells's guardian, she would **87 not have had authority to compromise claims against Wells (only a conservator could do so). But whether or not that is true, the fact remains that RPC 1.2(c) pertains only when a client engages in illegal or fraudulent conduct that the lawyer "knows" to be illegal or fraudulent. The Bar's argument at best suggests that respondent *748 was negligent in relying on the representation in the ledger that Boyce-Wells's supposed guardian-had signed off on the expenditures. That argument does not establish by clear and convincing evidence that respondent knew that the expenditures itemized in the ledger could not be attributed to Wells or her trust.[23] For that matter, neither does it prove by clear and convincing evidence that the expenditures in fact were not for Wells's benefit.
The second strand of evidence on which the Bar relies is respondent's own testimony about her understanding of Andrach's financial circumstances. The Bar notes that, as the person who prepared and filed Andrach's earlier bankruptcy petition, respondent would have known that, at the time of the filing of that petition, Andrach had only $11,175 in assets and $916 in monthly income. The Bar then observes that, when confronted with that fact and asked where Andrach could have gotten $53,000 that he claimed to have paid for trust expenses, respondent could not identify any significant source of income that Andrach might have had, other than money that Robertson had sent him. As to that money, the Bar argues, respondent must have known that it always came with specific instructions about how it was to be spent (for Wells's benefit) and that it therefore was not Andrach's to spend or loan, and he would not be entitled to have it repaid to him.[24] Such knowledge can be inferred, the Bar argues, from evidence in the record showing the increasingly close relationship between respondent **88 and Andrach as they became romantic partners and purchased a house together, and the high degree of information that the two were sharing in their emails to each other.
We are not persuaded. First, the Bar did not prove by clear and convincing evidence that Andrach did not have funds of his own to spend for Wells's benefit. Some of the expenditures that Andrach made (more than $20,000) were made prior to his filing for bankruptcy, and respondent testified, albeit vaguely, about other possible sources of income to Andrach in the months after his bankruptcy-work on a friend's construction project and on a family member's shop in California, and some work for respondent herself. Second, even if Robertson was the source of some of Andrach's funds, the Bar did not prove that Robertson always provided specific instructions to Andrach to use those funds only for Wells's benefit or that respondent knew about any such instructions. One can easily imagine that Andrach might keep Robertson's instructions about the money to himself. And, on a more general level, the fact that respondent and Andrach were romantic partners and cohabitants who communicated by email on a constant basis does not establish that Andrach told respondent that he was seeking reimbursement to which he was not entitled. Ultimately, respondent's inability to specifically explain where Andrach got his money does not constitute clear and convincing evidence that she knew that Andrach did not spend $53,000 of his own money on trust expenses.
The Bar relies, finally, on Andrach's bankruptcy petition itself-specifically, the fact that it does not include any reference to money that Andrach would later claim that he had spent to benefit the trust ($20,000) before filing for bankruptcy and that he was entitled to reimbursement. The Bar asserts that, as an expert in bankruptcy law, respondent would have known that, if Andrach had been owed that money at the time of the bankruptcy, he was required to declare it as an asset in his bankruptcy petition-and that his failure to do so amounted to fraud. Once respondent became aware that such an asset had been omitted from the bankruptcy, the Bar continues, she had an obligation to advocate *749 for reopening the bankruptcy case to "rectify the fraud." Her failure to do so, the Bar argues, assisted **89 Andrach in a fraud on the bankruptcy court (a claim that we do not consider because it was not alleged in the Bar's complaint), and her creation of a trust deed based in part on claimed "loans" that she thus knew to be fraudulent also constituted assisting Andrach in committing fraud.
In so arguing, the Bar fails to confront an alternative explanation for respondent's failure to reopen Andrach's bankruptcy case, after later learning that Andrach was seeking reimbursement for money that he purportedly paid before his bankruptcy for the benefit of the Wells Trust. In her testimony, respondent stated that, while she understood, in retrospect, that she should have reopened Andrach's bankruptcy case to include the claim for reimbursement as an asset, she had not thought about it at the time-or at any time, until she heard the Bar's expert testify about her obligation to do so. If respondent was testifying truthfully, then her drafting of the trust deed and promissory note without simultaneously reopening Andrach's bankruptcy case would suggest negligence, rather than knowledge that Andrach's claim for reimbursement was fraudulent. In light of that plausible alternative explanation, the absence of any report of the debt in the bankruptcy petition does not constitute clear and convincing evidence that respondent knowingly assisted Andrach in a fraud against the Wells Trust. The Bar has failed to prove a violation of RPC 1.2(c) in this matter.
c. The $9,500 check to TLA Properties LLC
The Bar asserts that respondent assisted Andrach in a fraud when she defended a $9,500 check that Andrach had written on one of Wells's credit accounts at a time when he lacked authority to do so. The following facts are relevant to that claim.
In mid-May 2013, after quarreling with Andrach and respondent, Boyce attempted to oust Andrach from his positions as Wells's trustee and attorney-in-fact. She obtained Wells's signature on two documents, one of which purported to revoke all prior powers of attorney that Wells had granted and appoint Boyce as her attorney-in-fact, and the second of which purported to remove Andrach as the successor trustee of the Wells Trust and appoint Boyce in his **90 stead. On May 21, 2013, Boyce sent an email to respondent informing her that Wells had executed those documents. On May 31, 2013, however, Wells executed two more documents. The first revoked the designation of Boyce as successor trustee of the Wells Trust, and the second, a new "special power of attorney," designated Wells's sister, Jordan, as her attorney-in-fact.[25] Jordan, who lived in Colorado, had become concerned about Andrach's handling of Wells's finances and had hired a lawyer, Ratcliffe, to obtain Wells's signatures on those documents and to further assist Jordan in ousting Andrach from his position as successor trustee.[26]
On June 10, 2013, Ratcliffe wrote to one of Andrach's lawyers, Alexander, to inform Alexander of Jordon's appointment as attorney-in-fact and to demand that Andrach cease all actions on behalf of Wells and the trust. Around that same date, Jordan closed Wells's bank accounts. On June 21, Jordan filed a petition in Deschutes County Circuit Court seeking appointment as Wells's temporary conservator and successor guardian. The court granted the petition on July 1, 2013, and subsequently terminated the power of attorney that Wells had granted to Andrach, on July 5, 2013. Andrach resigned as trustee a few days later, on July 9, 2013.
On or around July 18, 2013, respondent received notice from Washington Federal Bank about a claim of fraud regarding a check for $9,500 that had been made out to TLA Properties and deposited in the TLA
*750 Properties account. A month earlier, on June 17, 2013, Andrach had signed Wells's name on the check, which was drawn on Wells's personal line of credit with Evergreen Federal Bank. Jordan had become aware of the check on July 3, 2013, and had submitted an affidavit to Evergreen Federal, asserting that the check was a forgery. Evergreen Federal conveyed the notice of fraud to the receiving bank, Washington Federal, which **91 froze the funds in the TLA account and sent the notice of the claim of fraud to respondent and Andrach.
Respondent responded to the notice in a letter dated July 18, 2013. In it, she stated that Andrach had a power of attorney, dated September 17, 2012, and recorded with Deschutes County in January 2013, which authorized him to sign for financial matters concerning Wells; that the court had not terminated Andrach's authorities under that power of attorney until July 5, 2013; and that Jordan was aware of those facts.[27] Respondent appended a copy of the September 17, 2012, power of attorney-the invalid one that Andrach had mistakenly recorded. Both banks seemingly accepted respondent's explanation: Washington Federal unfroze the funds, and Evergreen Federal stated, in a letter to Jordan explaining its conclusion that there had been no fraud, that, "from the facts as we know them," Andrach had written the $9,500 check while his power of attorney was in effect and the check had been deposited and paid during that time.
The Bar alleged that respondent violated RPC 1.2(c) when, upon receiving the notice from Washington Federal Bank, she sent a letter to the bank "falsely asserting that Andrach was acting under a valid power of attorney when he signed the $9,500 check." The Bar advances two different theories as to why that assertion was false: (1) Andrach's authority to write checks on Wells's accounts as her attorney-in-fact or as trustee of her trust had already been rescinded when Andrach signed the check June 17, 2013; or (2) Andrach's authority to sign checks in Wells's name did not extend to checks written for his own benefit, and respondent knew that the $9,500 check to TLA Properties, LLC, was written for Andrach's own, rather than Wells's, benefit. To prove that respondent violated RPC 1.2(c) under either theory, the Bar was required to prove both that Andrach was not acting under a valid power of attorney at the time that he signed the check and that respondent knew , at the time of her letter to Washington Federal Bank, that Andrach had not acted under a valid power of attorney. See RPC 1.2(c)
**92 (lawyer shall not assist a client in conduct the lawyer knows is illegal or fraudulent).
Unlike the Bar's evidence for the prior incidents that we have discussed, the evidence that Andrach acted fraudulently with respect to the $9,500 check is strong. Jordan informed Andrach's attorney on June 10, 2013, that Andrach's authority had been revoked. On or around that same date, Jordan closed Wells's bank accounts. Although the Bar did not provide explicit evidence that Andrach knew of those actions, we can infer his knowledge of those events from his attorney's knowledge and from the fact that he turned to writing checks on Wells's line of credit, rather than on her bank accounts. We cannot necessarily infer, however, that respondent had the same information that Andrach had.
In support of its theory that respondent knew that Andrach's power of attorney had been rescinded before he wrote the check, the Bar presented copies of (1) the $9,500 check itself, dated June 17, 2013; (2) the special limited power of attorney that Wells had signed in favor of Boyce on May 16, 2013, which purported to rescind all prior powers of attorney; (3) the "special power of attorney," dated May 31, 2013, designating Jordan as Wells's attorney-in-fact and rescinding all prior powers of attorney; (4) the email from Boyce to respondent, dated May 21, 2013, stating that Wells had signed a power of attorney removing Andrach as attorney-in-fact and temporarily designating Boyce in his stead; and (5) the June 10, 2013, letter from Jordan's lawyer, Ratcliffe, to one *751 of Andrach's lawyers, Alexander, stating that Wells had removed Andrach as trustee and asking him to inform Andrach that he must cease and desist from any actions on behalf of the trust. The implication that the Bar sought to educe from that evidence was that respondent knew that Andrach's authority to sign checks on Wells's behalf had been rescinded by May 21, 2013, or June 10 at the latest, and that he therefore had no authority to write a check in Wells's name on June 17, 2013.
The Bar's evidence is not clear and convincing. The June 10, 2013, letter to Alexander is unpersuasive because there is no accompanying evidence showing that the contents **93 of that letter were conveyed to respondent.[28] And while the May 21, 2013, email from Boyce might show that respondent knew that Boyce understood that Andrach's power of attorney had been rescinded on May 16, 2013, i.e., before he wrote the check, it does not establish that respondent shared that understanding. In fact, other evidence shows that respondent believed that, as a protected person who had been appointed a guardian, Wells lacked the legal capacity to execute a new power of attorney in May 2013, so that the power of attorney document that Boyce had alluded to in her email could not change Andrach's authority to sign checks in Wells's name.
That belief was not unreasonable. Although the Bar was able to show, through the testimony of an expert, that the incapacity that supports the appointment of a guardian does not necessarily signify incompetence to execute a contract such as a power of attorney, it did not show that respondent did not and could not have believed that Wells was incompetent under the correct standard. In fact, there is evidence that Jordan had a similar belief. Jordan made some initial inquiries aimed at establishing Wells's competency to grant her a power of attorney, but she gave up in favor of a judicial process to have herself appointed as Wells's guardian and conservator, and to suspend all powers of attorney that Wells previously had granted. The fact that Jordan opted for that route suggests that even she and her lawyer, Ratcliffe, were uncertain about whether Wells had been competent to grant the May 31, 2013, power of attorney in Jordan's favor, which in turn suggests that respondent's legal theory-that Andrach's authority as attorney-in-fact **94 had been unaffected by Wells's execution of that document-was reasonable. See In re Hockett , 303 Or. 150, 162 n. 3, 734 P.2d 877 (1987) (lawyer who has a "reasonable and good faith basis for concluding that conduct is legal" ought to be able to so advise a client without the risk of discipline). After considering all of that evidence, we cannot find, by clear and convincing evidence, that respondent knew that Wells possessed the legal capacity to execute a new power of attorney on May 16, 2016, when she received Boyce's May 21, 2013, email stating that Boyce had replaced Andrach as Wells attorney-in-fact. Neither can we find by clear and convincing evidence that respondent had learned of the June 10, 2013, letter from Ratcliffe to Alexander, or its underlying substance, before she wrote the Washington Federal Bank to defend the $9,500 check.
The Bar contends, in the alternative, that respondent knew that her assertion that Andrach wrote the check under a valid power of attorney was false because she knew that Andrach had written the check for his own benefit, in contravention of his statutory duty as attorney-in-fact to use the property of his principal only for the benefit of the principal. ORS 127.045 ("Unless otherwise provided in *752 the power of attorney document, an agent must use the property of the principal for the benefit of the principal."). In support of that theory, the Bar points primarily to respondent's inability to fully explain why the TLA account would have received those funds or to show that Andrach had himself paid $9,500 worth of expenses for the benefit of Wells or the Wells Trust, and that he was entitled to reimbursement for those expenses.
Again, the Bar failed to prove the essential facts underpinning that theory-both that the check was not written to pay for expenses attributable to Wells and that respondent knew that that was the case-by clear and convincing evidence. It was not respondent's burden to disprove those facts. As far as we can tell, there is no evidence in the record that speaks directly to respondent's knowledge at the time of her letter about what the $9,500 check was for. There was some evidence, on the other hand, showing that Andrach could have spent $9,500 for Wells's benefit. At trial, after perusing an exhibit that consisted of checks **95 that Andrach had written on the TLA account at around the time of the $9,500 check, respondent testified that (1) she had her own personal checking account and did not monitor the TLA account at the time of the $9,500 check; (2) Andrach appeared to be using the TLA as his personal checking account at that time; (3) some of the checks that Andrach had written on the TLA account appeared to have been for expenses relating to Wells's horses and dogs, and the notation on one check indicated that it was for attorney fees; and (4) the check for attorney fees was not for her services, but it could have been for any one of several attorneys that Andrach had retained at the time, including some who were working on trust matters. The import of that testimony would seem to be that Andrach could have written the $9,500 check to TLA Properties to reimburse himself for expenditures that he had made on Wells's behalf but that respondent would have no reason to know one way or the other if he had done so.
We cannot find by clear and convincing evidence that respondent knew, when she defended the $9,500 check, that the check had been written outside of the scope of Andrach's power of attorney, i.e. , because she knew he lacked authority to write any check from Wells's accounts or because she knew that that particular check was not for Wells's benefit.
d. The Vinson leases
The Bar alleged that respondent violated RPC 1.2(c) by "draft[ing] one or more leases in which she falsely and fraudulently identified Andrach as the lessor of property that she knew actually belonged to the Wells Trust." The facts surrounding this final incident are very much in dispute. The Bar presented the testimony of Vinson, who initially had signed a three-month lease to the property in question in February 2013. That lease, which was presented as an exhibit, specified that Vinson's rent payments would be made to Wells. Vinson testified that she had signed a second lease in May 2013, but that she had not been given a copy of that lease. She then testified that, in late July 2013, Andrach had asked her to come to respondent's office and sign a third lease, which had been backdated to May 2013. A lease with a May 2013 date was presented as an exhibit. That **96 lease instructed Vinson to direct her payments to Andrach. Vinson insisted that, when she went to respondent's office to sign the third backdated lease in July, respondent was there with Andrach and that respondent personally made changes to the lease on her computer in Vinson's presence before Vinson signed it. She denied that it might have been respondent's legal assistant, Nichols, who was present and made the changes.[29]
However, respondent's legal assistant, Nichols, testified that, in May 2013, Andrach *753 had asked the assistant to help draft a new residential lease for Vinson while Vinson was at respondent's office; that she had downloaded a form lease, which Andrach marked up with the changes he wanted; that Vinson could not wait until Nichols typed in the changes and completed the formatting, and so had left; and that Andrach had taken the completed, revised lease to Vinson the next day for her signature. According to Nichols, respondent was not involved or even present during that episode. Nichols also testified that, some weeks later, she had typed and formatted an addendum to the May 2013 lease, which respondent had drafted at Andrach's request. The addendum, which allowed Vinson to terminate the lease on short notice, was presented to the trial panel as an exhibit.
Respondent's testimony seemed to confirm Nichols's account. Respondent testified that, although she had not been involved in the drafting or execution of any residential lease for Andrach, she had, at Andrach's request, drafted an addendum to a May 2013 lease, which allowed Vinson to terminate the lease on short notice. She further testified that she had given the draft to her legal assistant, Nichols, to format, and had been in her office, but uninvolved, when Vinson came in to sign it.
It appears that the theory behind the Bar's contention that respondent violated RPC 1.2(c) is that, in late July **97 2013, knowing that Andrach had resigned as trustee and no longer had any right to collect funds on behalf of the trust, respondent personally made changes to a lease for Vinson that directed Vinson to make her rent payments to Andrach and that, together with Andrach, respondent obtained Vinson's signature on the lease. Underpinning that theory is the Bar's assumption that the "May 2013" lease that is included in the record-which instructed Vinson to make her rent payments to Andrach-was in fact signed in late July, when respondent incontrovertibly knew that Andrach no longer was the trustee. That assumption largely relies on Vinson's testimony that there were three leases and that one of those was signed in late July but backdated to May.
But there is evidence in the record that blunts the force of Vinson's testimony. While we assume that Vinson was telling the truth to the best of her recollection when she testified about signing a third lease in July 2013, the absence of any clear physical evidence of three leases, the undisputed existence of an addendum to the May 2013 lease, and the unified account provided by Nichols and respondent all suggest a distinct possibility that, in her testimony, Vinson was misremembering certain details. Taking all the testimony and exhibits relating to the Vinson lease into account, the simplest explanation is that there was no July lease and that Vinson mistakenly remembered the addendum to the May lease (which had nothing to do with who Vinson was supposed to pay) as being an entirely new lease. And while Vinson insisted that it was respondent, and not Nichols, who made the changes that Andrach had suggested to the lease that Vinson had come to respondent's office to sign, and that those events occurred in late July, the combined testimony to the contrary of Nichols and respondent raises the not insignificant possibility that Vinson also was mistaken in regard to those facts as well. The lease that names Andrach as the payee is dated May 2013, and the Bar does not claim that respondent knew that Andrach had no authority to make that change at that time. In the end, the evidence does not support, under the required clear and convincing evidence standard, that respondent participated in the drafting, modification or execution of a lease that required Vinson to make her rent payments to Andrach in **98 late July 2013, when she knew that Andrach had no authority to collect rent on behalf of the Wells Trust. Accordingly, the Bar failed to prove a violation of RCP 1.2(c) under that theory.
3. RPC 4.1(b) -Assisting in fraud by failing to disclose a material fact
RPC 4.1(b) provides:
"In the course of representing a client, a lawyer shall not knowingly * * * fail to disclose a material fact when disclosure is necessary to avoid assisting an illegal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6."
*754 The Bar's complaint alleged two failures by respondent to disclose a material fact: (1) a failure to "advise Wells that [respondent] was not her attorney"; and (2) a failure to "disclose to Wells that Andrach had already sought to access funds owned or claimed by Wells by fraudulently signing Wells's name to a check made payable to Robertson for $66,000." In its arguments before the trial panel, the Bar focused on the latter nondisclosure allegation as the basis for its claim of violation. We reject that theory of violation out of hand, because, as discussed above, 363 Or. at ----, 418 P.3d at ----, the evidence does not support its underlying premise-that Andrach signed the $66,000 check to Robertson. To the extent that the Bar might also wish to argue that respondent violated the rule by failing to advise Wells that she was not Wells's attorney, that argument would fail for the same reason. The failure to disclose must be necessary to avoid assisting an illegal or fraudulent act, and the only underlying fraudulent act that respondent's nondisclosure to Wells would assist would be Andrach's unauthorized signing of the $66,000 check-an act that the Bar did not prove.
The Bar now theorizes that respondent violated RPC 4.1(b) in an entirely different incident-when she defended the $9,500 check Andrach wrote to TLA Properties to Washington Federal Bank. The Bar suggests that her defense of the check was a misrepresentation by nondisclosure because she did not disclose to the bank "that she did not know of any legitimate reason TLA would have for **99 receiving $9,500 from Wells and that Andrach was aware of the revocation of his power of attorney prior to the execution of the check." But, because the Bar's complaint contains no allegation of a nondisclosure of that nature, we decline to consider the argument. See Ellis/Rosenbaum , 356 Or. at 738, 344 P.3d 425 (court will not consider charges that have not been sufficiently alleged).
The Bar failed to prove by clear and convincing evidence that respondent violated RPC 4.1(b) in any of the ways that it alleged or argued.
4. RPC 8.4(a)(3) -Dishonesty, fraud, deceit, or misrepresentation
A lawyer violates RPC 8.4(a)(3) if he or she engages in "conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law." The Bar contends that respondent violated the rule by knowingly misrepresenting material facts to various persons in the course of her representation of Andrach. It argues, specifically, that respondent (1) falsely represented to Wells, by means of a nondisclosure, that she was Wells's lawyer, thereby lulling Wells into signing a power of attorney that she otherwise would not have signed; (2) falsely identified Andrach as the lessor of property belonging to the Wells Trust in the Vinson lease; (3) falsely asserted to Washington Federal Bank that Andrach was authorized to write the $9,500 check on Wells's line of credit; and (4) created a promissory note and a trust deed that falsely asserted a debt owed by the Wells Trust to Andrach. The Bar contends that, when considered together, those material misrepresentations constitute a course of conduct that reflects respondent's fundamental dishonesty and unfitness to practice.
We have addressed each of these matters in connection with the Bar's other claims of disciplinary rule violations. In the matters of the $9,500 check and the trust deed, the Bar failed to show by clear and convincing evidence that respondent knew that Andrach lacked the necessary authority at the relevant time (assuming that he did lack the necessary authority). 363 Or. at ----, 418 P.3d at ----. It follows that respondent did not engage in conduct involving **100 misrepresentation or dishonesty in violation of RPC 8.4 (a)(3) in those matters because, to do so, one must have acted with a mental state of knowledge or intent. See In re Carpenter , 337 Or. 226, 234, 95 P.3d 203 (2004) (discussing RPC 8.4(a)(3)'s predecessor, former DR 1-102(A)(3)). With respect to the Vinson lease, the Bar failed to show, by clear and convincing evidence, that respondent participated in drafting or modifying a lease that was executed in July 2013 at a time that respondent knew that Andrach had no authority to act for Wells's trust. *755 363 Or. at ----, 418 P.3d at ----. And while the Bar demonstrates that respondent should have known that Wells misunderstood respondent's role when respondent sought Wells's signature on the power of attorney to Andrach, 363 Or. at ----, 418 P.3d at ----, it did not present clear and convincing evidence that respondent, in fact, knew of that misunderstanding, yet failed to correct it. Accordingly, the Bar failed to prove that respondent's conduct violated RPC 8.4(a)(3) in any of these matters.
IV. SANCTION
Of the numerous violations the Bar alleged, we have found that the Bar proved only one by the requisite clear and convincing evidence standard-a violation of RPC 4.3, by failing to make reasonable efforts to correct Wells's misunderstanding of respondent's role in obtaining a power of attorney for Andrach, when respondent should have known that Wells misunderstood that role. To determine the appropriate sanction for that violation, we first apply the analytical framework set out in the American Bar Association's Standards for Imposing Lawyer Sanctions (1991) (amended 1992) (ABA Standards). Under that framework, we identify a preliminary sanction based on the duty or duties that the lawyer violated, the lawyer's mental state, and any actual or potential injury caused by the lawyer's conduct. We then consider any aggravating or mitigating circumstances that might justify an adjustment to the preliminary sanction. After thus selecting an appropriate sanction under the ABA Standards, we consider whether the selected sanction is consistent with this court's case law. In re Gatti , 356 Or. 32, 55, 333 P.3d 994 (2014) ; In re Kluge , 332 Or. 251, 259, 27 P.3d 102 (2001).
**101 A. Duty Violated
In violating RCP 4.3, respondent breached her duty to avoid improper communications with individuals in the legal system. ABA Standard 6.3.
B. Mental State
Although we have found clear and convincing evidence that respondent should have known that Wells mistakenly believed that respondent was working for her as well as for Andrach, and that she should have corrected that mistaken belief, we have not found that respondent did in fact know of Wells's confusion. Accordingly, we conclude that, in failing to make reasonable efforts to correct Wells's misunderstanding, respondent acted negligently and not knowingly.
C. Injury
Turning to the issue of injury, we note that the ABA Standards define "injury" as "harm to a client, the public, the legal system or the profession which results from a lawyer's conduct." ABA Standards at 7. The standards recognize "potential injury," which is injury "that is reasonably foreseeable at the time of the lawyer's misconduct." We conclude that respondent's failure to correct Wells's misunderstanding about her role caused potential injury to Wells, because it prevented Wells from making a fully informed decision about seeking representation of her own in the power of attorney matter. With her own representation, Wells might have decided against signing the power of attorney, which in turn might have averted the subsequent expensive conflicts about control over her finances (although Andrach also took action as a trustee). Harm to Wells as a member of the public and as an actor in the legal system, in our view, constitutes a kind of harm that the ABA Standards were designed to address.
D. Preliminary Sanction
Based on the duty that respondent violated by her conduct, her mental state in engaging in that conduct, and the potential injury that the conduct caused, the ABA standards identify reprimand as the proper preliminary **102 sanction. See ABA Standard 6.33 ("Reprimand is generally appropriate when a lawyer is negligent in determining whether it is proper to engage in communication with an individual in the legal system and causes injury or potential injury to a party or interference or potential interference with the outcome of the legal proceeding."). *756 E. Aggravating and Mitigating Circumstances
Respondent, who has steadfastly denied any violation of the disciplinary rules, does not offer any mitigating factors, and we therefore find that there are none. The Bar suggests that there are five aggravating factors: (1) respondent acted with a dishonest motive, i.e. , to profit her own personal financial interests and those of her intimate partner, Andrach, ABA Standard 9.22(b); (2) respondent engaged in a "pattern of misconduct," ABA Standard 9.22(c); (3) respondent refused to acknowledge the wrongful nature of her conduct, ABA Standard 9.22(g); (4) the victim was vulnerable, ABA Standard 9.22(h); and (5) respondent had substantial experience in the practice of law, ABA Standard 9.22(i). Two of those suggested factors-the victim's vulnerability and respondent's substantial experience-appear to be relevant to the single disciplinary violation that we have found. We agree that those aggravating factors are present, but we do not find them so significant that they alter our assessment of the appropriate sanction. No adjustment to the preliminary sanction recommended in the ABA Standards is required.
F. Cases
Very few of our cases have involved a violation of the disciplinary rule governing lawyers' communications with unrepresented persons, and only one of those is even marginally relevant to the present proceeding. In In re Lawrence , 337 Or. 450, 98 P.3d 366 (2004), this court imposed a 90-day suspension on a lawyer who had had given legal advice to unrepresented person whose interests were likely to be in conflict with those of the lawyer's client, other than advice to secure counsel. The conduct at issue, which involved ghost-writing an unrepresented person's motion to dismiss domestic abuse charges against the unrepresented person's husband, who was the lawyer's client, 337 Or. at 454-55, 98 P.3d 366, was significantly more serious than the conduct at issue here.
**103 The respondent lawyer in Lawrence also acted knowingly, id. at 471-72, 98 P.3d 366, unlike respondent here, who acted negligently. Finally, the respondent lawyer in Lawrence was found to have made material misrepresentations to a judge who questioned her about her role in the unrepresented person's motion, and thus to have engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of another disciplinary rule, former DR 1-102(A)(3). Id. at 463-66, 98 P.3d 366. Those differences between the circumstances in Lawrence and those in this case fully explain why a suspension like the one imposed in Lawrence would not be appropriate here.
As to other lawyer discipline cases that might be relevant, those that involve violation of a closely related disciplinary rule, RPC 4.2 (former DR 7-104), seem to be the most comparable for purposes of determining a proper sanction. In virtually all those cases, which involve a lawyer, in the course of representing a client, communicating directly with the opposing party or another person he or she knows to be represented by a lawyer, the court concluded that the appropriate sanction was a reprimand. See, e.g. , In re Newell , 348 Or. 396, 413, 234 P.3d 967 (2010) (imposing that sanction); In re Smith , 318 Or. 47, 54, 861 P.2d 1013 (1993), cert. den. , 513 U.S. 866, 115 S.Ct. 183, 130 L.Ed.2d 117 (1994) (same); In re McCaffrey , 275 Or. 23, 28, 549 P.2d 666 (1976) (same). See also In re Lewelling , 296 Or. 702, 707, 678 P.2d 1229 (1984) (after imposing a 60-day suspension on a lawyer who had communicated with a represented party in a particularly egregious way, court explained that "communicating with a person the lawyer knows to be represented does not involve dishonesty or a breach of trust and if that were the only charge here we would impose only a public reprimand").
The case law supports our initial conclusion that the proper sanction for respondent's violation of RPC 4.3 is a reprimand. Accordingly, we impose that sanction.
Respondent is publicly reprimanded.

The prenuptial agreement provided, however, that, depending on how long the marriage lasted, Andrach would be entitled to a sum equal to a percentage of the market value of a designated house in the Wells Trust portfolio.

The Bar presented evidence that, in June 2012, respondent contacted two doctors who were treating Wells in California, seeking their opinion about Wells's mental competence and ability to travel to Oregon to participate in the Exchange Properties litigation. Respondent testified that that very minor involvement with the litigation occurred only because the lawyer responsible for the case-Bryant-was going out of town and asked her to follow up on requests that he already had made.

Andrach's debts were discharged in bankruptcy in October 2012, and he was dismissed from the Exchange Properties litigation soon thereafter.

Although respondent and Boyce shared office space, they had separate practices. Boyce was not a lawyer, but she held herself out as an expert in trusts and estates.

A guardian has custody of a protected person and general authority to provide for the care, comfort, and maintenance of that person. See ORS 125.315 (so providing). A guardian ad litem has authority to appear in a legal proceeding on behalf of an incapacitated person. See ORCP 27B (so providing).

It is not immediately evident what happened with the petition to name Boyce as Wells's guardian. Boyce suggested in her testimony that she had withdrawn the petition and asked only to be named as guardian ad litem.

Further details regarding this arrangement are provided below, 363 Or. at ----, 418 P.3d at ----.

ORS 87.430 grants an attorney a lien for compensation on papers, personal property and money of a client for services rendered to the client.

Wells's dissolution lawyers sought discovery of Andrach's communications with respondent. When Andrach asserted that those communications were protected by the attorney-client privilege, Wells's lawyers asserted that the communications fell within the "crime/fraud" exception to that privilege. OEC 503 (4)(a). The issue was set for argument, but the parties settled before that argument occurred.

The majority cited RPC 1.2(c) and 4.1(b) in this section of its opinion, but it is evident that it was describing a violation of RPC 8.4(a)(3).

Before the trial panel, the Bar argued that, even if respondent had a legitimate basis for asserting a lien for attorney fees, she could not rely on that lien to retain Boyce's records because she had waived her right to do so and because doing so would cause foreseeable prejudice to Boyce. The Bar does not appear to pursue those arguments before this court. In any event, the evidence that the Bar presented in support of those arguments is unpersuasive.

Section 31 of the Restatement (Third) of Restitution and Unjust Enrichment (2011) pertains to restitution to a performing party whose claim for payment cannot be enforced on the basis of the other parties' promise to pay because of the indefiniteness of the other parties' promise or a failure to satisfy an extrinsic requirement of enforceability.

Because we have determined that respondent had a right to assert a lien on Boyce's records under ORS 87.430 and for that reason did not violate RCP 1.16(d), we need not, and do not, decide whether respondent would have violated the rule if she did not have a right to assert a lien, but reasonably believed that she did.

Respondent testified that, during that call, Wells had informed her that the matter of the check had been resolved. It is unclear whether respondent ever specifically advised Wells that the bank would not accept the stop payment notice that Wells had signed.

Respondent could not explain how Andrach had obtained the September 17, 2012, document that he recorded. She denied having given it to him and testified that, instead, she had placed it in her files.

The trial panel majority determined that respondent had violated RPC 4.3 under the "legal advice" theory by preparing a stop payment order for Wells. That determination may be factually and legally correct, but the Bar complaint does not allege that respondent prepared the stop payment order at all or that doing so constituted giving legal advice. In that circumstance, respondent cannot be disciplined for violating RPC 4.3 for preparing the stop payment order.

In an early response to the complaints filed with the Bar, respondent explained to the Bar that Wells "did not want Andrach to pay her mother, so she did not want to sign the power of attorney."

Wells died in 2015, before the present disciplinary matters were tried.

If the Bar were to charge a lawyer with counseling a client to engage in illegal or fraudulent conduct, the Bar would not necessarily be required to prove that the client in fact engaged in such conduct.

In addition, as we will explain, Robertson did not testify before the trial panel, and the Bar did not call Boyce to testify on the Wells/Andrach matter.

We draw the foregoing facts about Boyce's involvement in the promissory note and trust deed from respondent's testimony. The Bar did not call Boyce to testify about this incident in its case in chief: It called her only to testify about her complaint that respondent had wrongly asserted a lien on her documents. However, respondent questioned Boyce as an adverse witness regarding the Wells/Andrach matter. In her answers, Boyce denied any involvement in compiling the documentation supporting the promissory note and trust deed and any knowledge of the contents of the conflict letter that she and Andrach had signed at respondent's request. Because the Bar expressly chose not to rely on Boyce's testimony in prosecuting the Wells/Andrach matter and has not disputed respondent's testimony about Boyce's involvement, and in light of certain other evidence on the record that reflects negatively on Boyce's testimony, we accept respondent's account of these facts as true.

These questionable expenditures that were approved for reimbursement by Wells's "guardian" include payments for Andrach's court-ordered domestic violence counseling. An explanatory note in the ledger states that Wells had admitted having lied about the domestic violence.

As noted above, 363 Or. at ----, 418 P.3d at ----, the Bar has not attempted to disprove respondent's contention that Boyce was involved in compiling the ledgers and supporting material. Neither has it attempted to disprove respondent's testimony that, at the relevant time, she believed that Boyce was acting as Wells's guardian and relied on Boyce's expertise in trust and estate matters. The Bar appears to argue only that, even if both of those things were true, respondent still must have known that some of the claimed payments were not made for Wells's benefit and therefore were fraudulent.

Robertson did not testify before the trial panel.

The special power of attorney was recorded on June 18, 2013.

Jordan had been named in the trust documents as a second successor trustee if Andrach was unable or unwilling to serve. Sometime in April or May of 2013, Andrach apparently had notified Jordan of his wish to divorce Wells and start a new life with respondent, and had offered to step aside as successor trustee if money that he felt that he was owed under his prenuptial agreement with Wells was forthcoming. Jordan did not accept that offer and instead enlisted Ratcliffe's assistance in legally ousting Andrach.

Respondent testified that, at the time that she wrote to Washington Federal, she was not aware of Ratcliffe's June 10, 2013, letter to Alexander or of the underlying facts, i.e. , that Jordan had obtained a special power of attorney from Wells on May 31, 2013.

Before this court, the Bar contends that, even if there is no evidence that respondent received contemporaneous notice of the June 10, 2013, letter from Ratcliffe to Alexander, other evidence shows that she "received a copy of a contempt motion in the Exchange Properties litigation which contained the same information." The Bar cites three exhibits in support of that contention. One of the cited exhibits appears to be irrelevant to the issue. The remaining two exhibits contain references to a contempt motion, but they do not include copies of the motion itself. Notably, both those exhibits, a letter and an email, discuss the motion in a way that suggests that it was not at all concerned with when Andrach lost his authority to act as Wells's attorney-in-fact. In short, the cited material does not appear to be evidence that respondent knew that Andrach's power of attorney authority already had been rescinded when he signed the $9,500 check on June 17, 2013.

At some point after Jordan obtained a power of attorney from Wells, Jordan contacted Vinson and tried to convince her that Andrach had no authority to collect rent from her on Wells's behalf. Vinson was unsure what to do and continued to pay rent to Andrach. On July 17, 2013, Jordan informed Vinson by email that Andrach had resigned as trustee. When confronted with that email during her testimony, Vinson continued to insist that she had signed the third, backdated lease with Andrach in late July.