Argued and submitted January 28, respondent publicly reprimanded
July 15, 2021

In re Complaint as to the Conduct of
# BRIAN CONRY,
OSB No. 822245,
*Respondent.*
(OSB 18-104) (SC S067502)

491 P3d 42

After a former client had posted negative online reviews regarding respondent, respondent posted responses that identified client's criminal convictions and (in one instance) client's identity. The Oregon State Bar charged respondent with violating Rule of Professional Conduct (RPC) 1.6, for disclosing information relating to the representation of a client. A trial panel of the Disciplinary Board concluded that respondent had violated the rule and imposed a 30-day suspension. *Held*: (1) Client's criminal convictions and identity were "information relating to the representation of a client" within the meaning of RPC 1.6(a), and thus violated the rule unless an exception applied; (2) respondent's disclosure of the specifics of client's criminal convictions was within the "self-defense" exception of RPC 1.6(b)(4), because respondent had "reasonably believe[d it] necessary" to provide the information, given the allegations in client's reviews; but (3) respondent was not objectively reasonable in his belief that it necessary to reveal client's name in responding to one review, and so respondent's violation of RPC 1.6(a) in that respect did not qualify for any self-defense exception under RPC 1.6(b)(4).

Respondent is publicly reprimanded.

En Banc

On review of the decision of a trial panel of the Disciplinary Board.

David J. Elkanich, Buchalter, A Professional Corporation, Portland, argued the cause and filed the briefs for respondent. Also on the briefs were Trisha Thompson and Peter R. Jarvis, Holland & Knight LLP, Portland.

Susan R. Cournoyer, Assistant Disciplinary Counsel, Tigard, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

Respondent is publicly reprimanded.

**PER CURIAM**

A dissatisfied former client of respondent Brian Conry posted three negative online reviews about him. Respondent posted online responses to all three reviews, disclosing that client had been convicted of two crimes, which he specifically identified. As to one review, respondent also disclosed client's full name. The Oregon State Bar charged respondent with violating Rule of Professional Conduct (RPC) 1.6, for disclosing information relating to the representation of a client. A trial panel of the Disciplinary Board agreed, rejecting respondent's assertions either that the information was not within the scope of the rule, or that he was privileged to disclose it under one of the rule's exceptions. The trial panel concluded that respondent should be suspended for 30 days, and respondent sought review from this court. We agree with the trial panel in part, but we conclude that respondent should be publicly reprimanded rather than suspended.

## I.   FACTS

A.   *Background: Rules of Professional Conduct Regarding Confidentiality*

Broadly speaking, the issues in this case are whether respondent revealed information relating to the representation of a client and, if he did, whether he was privileged to do so to respond to the client's online reviews. Before turning to the facts, we first set out the rules implicated by this case.

In general, an attorney is prohibited from revealing "information relating to the representation of a client." The relevant provision states:

> "(a)  A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b)."

RPC 1.6(a).

The phrase "information relating to the representation of a client" is defined broadly. It is not limited to information subject to the attorney-client privilege; it also

includes information that would be embarrassing or detrimental to the client:

> "(f) 'Information relating to the representation of a client' denotes both information protected by the attorney-client privilege under applicable law, and other information gained in a current or former professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client."

RPC 1.0(f).

The broad scope of the initial prohibition against revealing client confidences is, however, subject to a number of exceptions. They include: to prevent a client from committing a crime (RPC 1.6(b)(1)), to secure legal advice about complying with the ethical rules (RPC 1.6(b)(3)), and to comply with laws or court orders (RPC 1.6(b)(5)). The exception at issue in this case is the "self-defense" exception:

> "(b)  A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary:
>
> "* * * * *
>
> "(4)  to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client[.]"

RPC 1.6(b)(4).

B.  *Facts Preceding Posting of Reviews and Responses*

The following facts appear to be undisputed.

Respondent is a solo practitioner who primarily practices immigration law and criminal law. He was hired by client, who was facing deportation because of convictions for second-degree burglary and second-degree theft, both of which had been treated as misdemeanors. Respondent represented client between 2010 and 2015. In 2015, client had been ordered deported, and client then took his case to a different law firm.

Shortly after the second firm took up client's representation, an attorney there, Inna Levin, sent respondent a letter in April 2015. Levin asserted that respondent had conceded in the immigration proceedings that client's crimes were "crimes involving moral turpitude" that would justify client's deportation. Levin maintained that, after 2013 opinions by the United States Supreme Court, client's crimes no longer qualified as crimes involving moral turpitude. The letter concluded by asserting that Levin would file a claim against respondent for ineffective assistance of counsel in client's case, based on respondent's failure to raise the issue.

Respondent disputes Levin's assertions regarding whether client was deportable and whether those Supreme Court cases applied. Regardless, testimony before the trial panel shows that Levin's firm in fact made that argument. The federal government had then decided to cease pursuing the deportation of client.

C.  *First Bar Complaint Filed and Dismissed*

Client filed a first Bar complaint against respondent in December 2015. The Client Assistance Office concluded that client's "primary concerns do not raise an ethics issue that this office can investigate." As to the one ethics matter that was presented, the office dismissed.

D.  *Client Posts Online Reviews Critical of Respondent; Respondent Responds*

At roughly the same time that that first Bar complaint was pending, client posted negative reviews of respondent on the internet. Two of those reviews were posted before the Bar dismissed the first Bar complaint; the third was posted approximately three weeks afterwards. The reviews were posted on Yelp, Google, and Avvo.

Respondent posted responses to those reviews, and it is the content of those responses that are at issue here. All of respondent's responses were posted in June 2016. For organizational purposes, we set out each review and response separately.

1.  *Yelp*

Client's Yelp review was posted in December 2015 under "Yarik P," a shortened version of his first name and initial, together with his city of residence. The review stated:

> "Horrible experience with Brian Conry. He lost my case. The government has ordered me deported. I fired him. Went to Gonzales Gonzales Gonzales Immigration law firm. They helped me to appeale my case and we won in about in about 3 month! I found out that in my case I was not even deportble. But Brian Conry never told me that. He took over $20000 In 5 years of fighting this case and lost it. STRONGLY RECOMEND NOT TO HIRE THIS GUY!!!"

(*Sic* throughout.)

Respondent's response revealed that client had been convicted of both second-degree burglary and theft (italics added to identify statements at issue in this disciplinary action):

> "*Yarik has been convicted of theft as well as burglary in the second degree.* Mr. Conry was able to keep Yarik in the United States for approximately five years after assisting in getting him released from the detention center in Tacoma Washington where he was facing deportation.
>
> "I did not wish to represent Yarik on appeal to the Board of Immigration Appeal. However, it was my work in delaying his deportation that enabled him to be able to *make an appellate argument claiming his burglary in the second degree conviction with an underlying intent to commit theft is not a crime of moral turpitude.* This argument has enabled him to remain in the United States at this time. The law changed in the Ninth Circuit apparently to his benefit over the years while I represented him and kept him from being deported by raising all potential legal issues on his behalf that appeared plausible.
>
> "Yarik conflates the dollars paid for legal services with the dollars paid for costs like filing fees or for an investigator and misstates that the costs funds paid for filing fees or for an investigator were paid for attorney fees. The claim that Yarik was not deportable from the very start is a complete mistake of law on his part. The issue of *whether burglary in the second degree with an intent to commit theft is a crime of moral turpitude* was never heard by the courts. Yarik

should be thanking his lucky stars instead of posting. He does not know the law or just how lucky he has been.

"Please visit my website at brianpatrickconry.com for a list of 'wins' over the years that more accurately display my zealousness for my clients. Thank you."

(Emphases added.)

### 2. *Google*

Client posted the following review in February 2016, again under "Yarik P.":

"Brian Conry is a very CROOKED Attorney. Strongly recommend not to hire him! He took a very large amount of my money (around $30000) and still lost my case. Later when I hired a new attorney I found out that he made lots of mistakes, and the biggest one was that I was not deportable with the charges I had. And he still lost my case. I mean how bad of a lawyer do you have to be to lose something that cant be lost!? Anyway after I hired a new attorney for appeal I won my case in less than 6 month!!!"

Respondent's response is not fully contained in the record. The portion that is available, however, shows that he again revealed client's specific criminal convictions:

"This is a review of Yarik's flawed, lying review.

"Yarik has been convicted of theft as well as Burglary in the second degree. The legal issue presented by his deportation proceeding is whether his conviction for Burglary in the second [remainder of response not in record.]"

### 3. *Avvo*

On March 25, 2016, client posted the following review on Avvo, using only the name "yarik":

"Horrible attorney

"Strongly recommend not to hire him!

"He took a very large amount of my money (around $30000) and still lost my case. Later when I hired a new attorney I found out that he made lots of mistakes, and the biggest one was that I was not deportable with the charges I had. And he still lost my case. I mean how bad of a lawyer do you have to be to lose something that cant be lost? Anyway

after I hired a new attorney for appeal I won my case in less than 6 month!!!"

Respondent's response to this review not only revealed client's convictions for second-degree burglary and theft, but it also included the client's full name (again, emphasis added):

*"Mr. [Client Full Name] has been convicted of Burglary in the Second Degree as well as theft. I was able to keep Mr. [Client Last Name] in the United States for approxi-mately five years after assisting in getting him released from the detention center in Tacoma Washington where he was facing deportation charges. I did not wish to rep-resent Mr. [Client Last Name] on appeal to the Board of Immigration Appeals. However, it was my work in delaying his legally required deportation that enabled him to be able to make an appellate argument claiming his Burglary in the Second Degree conviction with an underlying intent to commit theft is not a crime of moral turpitude. This argu-ment has enabled him to remain in the United States at this time. The law changed in the Ninth Circuit he believes and argues to his benefit during the years while I repre-sented him and kept him from being deported by raising all potential legal issues on his behalf that appeared plau-sible. Mr. [Client Last Name] conflates the dollars paid for attorney fees with the dollars paid for costs, like for filing fees or Investigative services, and misstates what was paid for attorney fees. The claim that Mr. [Client Last Name] was not deportable from the very start is a complete, unsurprising mistake of law on Mr. [Client Last Name's] part. The issue of whether Burglary in the second degree with an intent to commit theft is a crime of moral turpitude was never heard by the courts. From the very beginning and today, theft is a crime of moral turpitude under the immigration laws. [Client Full Name] should be thanking his lucky stars instead of posting ludicrous, defamatory information. He does not know the law or just how lucky he has been. I would not be surprised if when the appeals court hears this issue; Mr. [Client Last Name] learns that he is still deportable due to his conviction for Burglary in the second degree. At this point, it is an open legal issue which has yet to be decided by the appeals courts. Link to www. brianpatrickconry.com for a list of representative wins by my law firm and the truth about who I am and how zeal-ously I represent my clients Thank you[.]"*

E.   *Second Bar Complaint Regarding Responses*

Client learned of respondent's responses shortly after they were posted. In July 2016, he filed a second Bar complaint regarding respondent's response to the Avvo review.

Respondent deleted client's full name from the Avvo response approximately one month after posting it, apparently after speaking with an attorney. Respondent ultimately removed all three posts in about October 2016 after attending a seminar in which he "learned that [his] online posting responding to [client's] online posting would likely be found by a number of bar disciplinarians to be inappropriate."

F.   *Trial Panel Decision*

In November 2018, the Bar filed a formal complaint charging respondent with violating RPC 1.6 for revealing information relating to the representation of a client without the client's permission. The matter went to a trial panel of the Disciplinary Board.

Respondent's defense consisted of two main parts. First, he claimed that he had not revealed information under RPC 1.6(a). Alternatively, he asserted that he was entitled to do so under the self-defense provision of RPC 1.6(b)(4), in that he had reasonably responded to a controversy between himself and client.

The matter proceeded to trial, and the trial panel took testimony and issued a lengthy opinion. The panel concluded that respondent had violated RPC 1.6(a) and that he was not entitled to do so under RPC 1.6(b)(4).

The panel first determined that respondent had revealed "information relating to the representation of a client" under RPC 1.6(a). He had disclosed client's full name and criminal conviction history, both of which he had learned in the course of representing client. The disclosure of that information was embarrassing to client. The panel added that, although client had mentioned that he had "charges" in two of the three reviews, client had not revealed that he had been *convicted*, nor had he disclosed the nature of those crimes.

The panel then turned to whether respondent was permitted to reveal the information under RPC 1.6(b)(4). The panel rejected the Bar's assertion that a "controversy" with a client required some sort of formal proceeding. The panel concluded, without finally deciding, that there probably was a "controversy" within the meaning of the rule.

That said, the panel nevertheless concluded that respondent was not protected by RPC 1.6(b)(4), because the disclosures were not limited to what respondent would "*reasonably* believe[] necessary":

"We find that disclosing the client's full name and criminal convictions do not fit within this limitation. No reasonable argument supports the conclusion that these facts were necessary to defend respondent's work or reputation."

Regarding the sanction, the panel concluded that respondent had breached a duty to his client and that he did so intentionally to discredit the client. The preliminary sanction for intentionally revealing client confidences would ordinarily be disbarment.

The panel found the following aggravating circumstances:

- Dishonest or selfish motive.

- Refusal to acknowledge the wrongful nature of the conduct.

- Substantial experience in the practice of law.

The panel found the following mitigating factors:

- No prior record of discipline.

- Cooperation with Disciplinary Counsel.

- Good character or reputation.

After evaluating the aggravating and mitigating factors, the panel concluded that a 30-day suspension was appropriate.

Respondent sought review. He renews his arguments that he did not reveal information relating to the representation of a client under RPC 1.6(a); that, if he did, he

was privileged to do so in his own defense under RPC 1.6 (b)(4); and that, if we reject both of those arguments, the rules violate his constitutional rights to free speech.

## II.  DISCUSSION

### A.  *Standard of Review; Overview*

This court reviews decisions of the trial panel *de novo.* ORS 9.536(2); BR 10.6. The burden is on the Bar to establish alleged misconduct by clear and convincing evidence. BR 5.2.

The issues presented here may be divided into two broad categories. The first is whether respondent's responses to the online reviews violated the general prohibition of RPC 1.6(a). The second is whether respondent was nevertheless permitted to take that action under the "self-defense" exception of RPC 1.6(b)(4). We will consider those issues in sequence.

### B.  *Online Reviews and Client Confidentiality*

This case raises important and difficult considerations regarding the developing importance of online reviews for attorneys' practice of law and the limits on their responses to such reviews given their obligation to protect client confidentiality.

A lawyer may have conflicting responsibilities to clients, to the legal system, and to the lawyer's own interests. The potential conflicts are recognized in the preamble to the American Bar Association's Model Rules of Professional Conduct:

"[8]   A lawyer's responsibilities as a representative of clients, an officer of the legal system and a public citizen are usually harmonious. \*\*\* [A] lawyer can be sure that preserving client confidences ordinarily serves the public interest because people are more likely to seek legal advice, and thereby heed their legal obligations, when they know their communications will be private.

"[9]   In the nature of law practice, however, conflicting responsibilities are encountered. Virtually all difficult ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system and to the lawyer's

own interest in remaining an ethical person while earning a satisfactory living."

ABA *Model Rules of Professional Conduct*, Preamble ¶¶ 8-9, https://www.americanbar.org/groups/professional_ responsibility/publications/model_rules_of_professional_ conduct/model_rules_of_professional_conduct_preamble_ scope/ (obtained July 9, 2021).

The online world has created opportunities for attorneys to engage in marketing through social media. At the same time, however, it also "provide[s] a platform for unsatisfied clients to post content that could harm a lawyer's reputation or practice." Pamela A. Bresnahan & Lucian T. Pera, *The Impact of Technological Developments on the Rules of Attorney Ethics Regarding Attorney-Client Privilege, Confidentiality, and Social Media*, 7 St. Mary's J on Legal Malpractice & Ethics 2, 19 (2016). Another commentator summarized the issues as follows:

"The advent of the Internet and social media has revolutionized the way society communicates, the speed in which news is disseminated, and the approach that people take in their daily decision-making. Online reviews are now commonplace on nearly every consumer-related website. Consequently, attorneys are also being publicly scrutinized by their clients on a range of topics from price, competence, satisfaction, personality, communication, and effectiveness. On one side of the coin, this new phenomenon can be very rewarding since attorneys were previously limited to receiving a small number of referrals from the word-of-mouth promotion before the creation of online reviews. However, the exact opposite is [also] true. Negative online reviews, whether accurate or not, may deter potential clients from even giving the attorney a second thought. As a result, a firm's business can feel the immediate impact of negative reviews."

Angela Goodrum, *How to Maneuver in the World of Negative Online Reviews, the Important Ethical Considerations for Attorneys, and Changes Needed to Protect the Legal Profession*, 24 Info & Comm Tech L 164, 164 (2015).

The availability of those attorney reviews implicates varying interests for the client, the attorney, and the public.

These interests include the interests of clients in being able to post truthful reviews, the interests of attorneys in being able to respond to false or misleading reviews, and the interests of the public in having access to reviews that can help them be more informed consumers of legal services. At the same time, there is an important client interest in the attorney keeping the client's confidences. As another commenter explained:

> "Clients have an interest in the ability to share information with others about their experiences with their lawyers. Whether happy or dissatisfied, the ability to voice one's opinion about the quality of services is important to consumers as evidenced by the explosion of online reviews. Clients of legal services, however, also have a stake in having their lawyers maintain the confidentiality of the information learned during the course of legal representation. This raises issues unique to lawyers and physicians— unlike other service providers, their ability to respond to online criticism is constrained by confidentiality and privacy obligations.

> "The public has an interest in learning information about lawyers whom they are considering hiring. In the absence of a word of mouth referral, it is quite difficult for the general public to learn information about lawyers whom they may want to hire, such as their ability to demonstrate responsiveness, empathy, competence, etc."

Laurel A. Rigertas, *How Do You Rate Your Lawyer—Lawyer's Responses to Online Reviews of Their Services*, 4 St Mary's J on Legal Malpractice & Ethics 242, 245 (2014).

As suggested above, it appears that negative online reviews may have a dramatic impact on an attorney's income. 368 Or at 359-60. One law review article from 2015 contained substantial discussion of the effects of online reviews on businesses generally, and—to the extent the data was available at the time—on attorneys specifically. Goodrum, 24 Info & Comm Tech L at 168-71. A 2014 study, for example, had concluded that "[e]ighty-three percent of respondents indicated that their review of online feedback was their first step to finding an attorney." *Id*. at 170 (footnote omitted). In the context of online reviews of restaurants, a 2011 study concluded that a drop of one star in

ratings could affect revenue between five and nine percent. *Id*.[1]

An attorney's access to client secrets enables an attorney to use, or threaten to use, confidential or embarrassing client information against the client and for the attorney's personal benefit. The attorney's ability to harm the client is amplified when an attorney can functionally publicize a client's secrets to the entire online world at the click of a button. As one legal treatise explained:

> "The client's desire to keep information from others can be manipulated by a lawyer to force the client to accede unwillingly to the lawyer's demands. The lawyer's use of the client's secrets in this way is obviously unfair and violates the lawyer codes."

Charles W. Wolfram, *Modern Legal Ethics* § 6.7.5, 303 (1986) (footnote omitted). Professor Wolfram cites as examples an attorney who reported a client for tax violations after a fee dispute arose (*In re Nelson*, 327 NW2d 576, 578-79 (Minn 1982)); an attorney who threatened to report a client for having received payments "under the table" unless the client withdrew a bar complaint against him (*Bar Assn. of Greater Cleveland v. Watkins*, 68 Ohio St 2d 11, 12, 427 NE2d 516, 517 (1981)); and an attorney representing adoptive parents who threatened to reveal his clients' identity to the natural mother unless they paid the mother's hospital bill (*In re Strobel*, 271 SC 61, 244 SE2d 537 (1978)). *See also* Henry D. Levine, *Self-Interest or Self-Defense: Lawyer Disregard of the Attorney-Client Privilege for Profit and Protection*, 5 Hofstra L Rev 783, 811 (1977) ("[O]ne can easily imagine a wealthy client paying inflated 'fees' to prevent disclosure of particularly delicate confidences."); *id*. at 811 n 132 (client's fear that attorney might disclose confidential information could "'easily be used to stifle disbarment or criminal proceedings against [the attorney]'" (quoting ABA Comm. on Professional Ethics Opinions, No. 19 (1930)).

---

[1] We do not suggest that those survey figures are accurate or trustworthy in themselves. Online marketing has changed substantially since 2015. The article's discussion also implicitly suggests that some of the surveys may have been problematic, either because they involved small numbers of respondents or because the respondents may have been disproportionately skewed toward the computer literate. But those figures do suggest, at least on a qualitative level, the size of the problem for attorneys.

RPC 1.6(a) is written broadly to protect clients against the disclosure and misuse of confidential information. It is important to note that its protections against the disclosure of "information relating to the representation of a client" extend beyond that protected by the attorney-client privilege. In interpreting both RPC 1.6(a) and the "self-defense" exception of RPC 1.6(b)(4), we think it is important to keep in mind that the stakes involved may vary depending on the nature of the information and the circumstances of the disclosure.

With that overview, we turn to the specific issues presented in this case.

C. *Did Respondent Reveal Information Relating to the Representation of a Client Within the Prohibition of RPC 1.6(a)?*

We begin with the first question: Whether respondent's responses to the online reviews fell within the scope of the general prohibition against revealing information relating to the representation of a client.

For the convenience of the reader, we repeat the relevant provisions. RPC 1.6(a) provides, in part:

> "A lawyer shall not reveal information relating to the representation of a client unless \*\*\* the disclosure is permitted by paragraph (b)."

RPC 1.6(a). "Information relating to the representation of a client" is:

> "both information protected by the attorney-client privilege under applicable law, and other information gained in a current or former professional relationship \*\*\* the disclosure of which would be embarrassing or would be likely to be detrimental to the client."

RPC 1.0(f).

The Bar does not assert that the information revealed by respondent was protected by the attorney-client privilege. The Bar only asserts that that information constitutes "information relating to the representation of a client." Whether respondent violated the rule requires consideration of two questions derived from the definition of that term:

whether the revealed information had been "gained in a current or former professional relationship," and whether the disclosure of that information was embarrassing or likely detrimental to client.

There is no dispute that respondent obtained client's name and the associated information about his criminal convictions during the course of the representation. Accordingly, it is "information gained in a * * * former professional relationship." RPC 1.0(f).

The second aspect of the definition requires us to consider whether the disclosed information either would be embarrassing to client or would likely be detrimental to him. In evaluating whether the information is embarrassing, this court has considered "[t]he nature of the disclosures, the overall tone of the [responses], and the circumstances surrounding [their] preparation." *See In re Huffman*, 328 Or 567, 581, 983 P2d 534 (1999) (regarding predecessor to RPC 1.6(a)).

Here, the nature of the disclosures was embarrassing. The audience consisted of people reading online reviews of attorneys. They had been told only that "Yarik P" had had criminal "charges." They had not been told client's name, his criminal history, or even that he had been convicted of any crimes.[2] Respondent revealed that client had been convicted, identified the specific criminal convictions, and (in the Avvo review) provided client's full name. That information was embarrassing.

In addition, client testified that he was in fact embarrassed by that information. He feared that it would become known by his employer, possibly costing him his job. He also feared that it would become known to members of his wife's family, who were very religious and who did not know about the convictions.

---

[2] Respondent argues that client's reviews, by containing the information that he was subject to deportation for "charges," revealed that he had been criminally convicted. That argument assumes that the audience for online attorney reviews knows that, pursuant to "8 USC § 1227(a)(2)," "only criminal convictions can support deportation." It is not clear that even most attorneys would be aware of that fact without first doing research. We will not assume that the average reader of online attorney reviews is aware of such distinctions.

Respondent nevertheless asserts that the information was not embarrassing to client as a matter of law. He relies on client's name and criminal convictions being matters of public record in themselves, as well as in the sense that a public records request to the Oregon State Bar regarding client's first Bar complaint would have led to that information being discovered. We are not persuaded. Respondent revealed the information to members of the public reading online reviews of attorneys. Client's reviews did not include his identity, or the fact of his convictions, or the specific criminal charges for which he had been convicted. Those who read respondent's posts might have been able to gather that information themselves, but they were unlikely to seek it, and they would have had difficulty determining which of the millions of criminal records on file around the nation referred to the author of the reviews.

It is theoretically possible that online readers could make a public records request with the Bar for complaints against respondent, thus identifying client and learning about his criminal convictions. But nothing about the reviews, or respondent's responses, revealed that client had filed a Bar complaint. Even if the readers of online reviews guessed that client had done so, there is no reason to conclude that they would be aware of the possibility of making a public records request, or that, for those who were aware, they would take the time-consuming steps necessary to investigate the details of a single review. Indeed, if it could be expected that readers would go to such lengths to investigate the matter, then respondent would not have needed to include that information in his responses to the reviews; he could have taken it as a given that interested parties would obtain that information from the Bar.

Respondent makes a related argument regarding a different part of RPC 1.6(a). Even if the information was "information relating to the representation of a client," he asserts that his disclosure did not constitute "reveal[ing]" it. RPC 1.6(a). This again is based on his contention that client's name and criminal convictions were matters of public record. Respondent notes that the definition of "reveal" includes:

> "to make (something secret or hidden) publicly known : DIVULGE <~ a confidence> <~*ed* his plans for the nation>."

*Webster's Third New Int'l Dictionary* 1942 (unabridged ed 2002).

We do not agree. Respondent omits another definition that is equally consistent with the rule's context:

> "to open up to view : show plainly or clearly : DISPLAY <the rising curtain ~ed a street scene> <the painting ~s the painter> <the dress ~ed nearly everything>."

*Id*. Moreover, respondent's argument implies that one should never describe someone as "revealing" information if any third party, anywhere, already knew it. Neither definition supports such a narrow understanding. "Reveal" has to do with the knowledge of the audience to whom the information is given. That is implied by the examples used in both definitions. A person may "reveal a confidence" even if some third party also knew the confidence. A political official may "reveal[] his plans for the nation" even if someone besides the official is aware of those plans. A rising curtain may "reveal[] a street scene" even if other audiences have seen the same street scene on prior nights.

Accordingly, we agree with the trial panel that respondent revealed information relating to the representation of a client within the meaning of RPC 1.6(a). That is a violation unless respondent falls within one of the exceptions of RPC 1.6(b). We turn to that question.

D.	*Self-Defense Exception of RPC 1.6(b)(4)*

As noted, RPC 1.6(b) lists several situations in which a lawyer may reveal information relating to the representation of a client. Respondent relies solely on the exception provided in RPC 1.6(b)(4). Again, that exception provides, in part:

> "(b)   A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary:
>
> "* * * * *
>
> "(4)   to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client[.]"

To be entitled to the defense, then, respondent must establish both that (1) there was a "controversy," and (2) he revealed information only to the extent that he "reasonably believe[d] necessary."

1. *"Controversy"*

In addressing the self-defense exception, the first question is whether client's reviews created a "controversy" between respondent and client. Respondent argues that there was a "controversy" because the reviews were defamatory and would support his filing a civil action against client. The Bar does not dispute respondent's contention that the reviews were defamatory, but it argues that "controversy" requires some formal legal proceeding. The trial panel, without deciding, suggested that it agreed with respondent, either because the public disagreement between client and respondent qualified as a "controversy," or because Levin's letter suggested a controversy regarding whether respondent had provided ineffective assistance of counsel.[3]

It is not clear how "controversy" should be interpreted. "Controversy" is not specifically defined in the Rules of Professional Conduct, and the general definitions of that word can be either broad (any dispute) or narrow (formal lawsuits).[4]

The comments to the source for RPC 1.6(b), Model Rule 1.6 of the ABA *Model Rules of Professional Conduct*, suggest that the self-defense exception is not limited to formally commenced legal proceedings. *See* ABA *Model Rules of Professional Conduct*, Rule 1.6 comment 10, https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_1_6_confidentiality_of_information/comment_on_

---

[3] The panel ultimately concluded that it was not necessary to determine whether there was a "controversy," because it held that respondent did not reasonably believe it necessary to reveal the information regardless.

[4] *See Webster's* at 497 (definitions include both "a cause, occasion, or instance of disagreement or contention" and "a suit in law or equity"); *see also Black's Law Dictionary* 417 (11th ed 2019) (definitions include both "[a] disagreement or a dispute, esp. in public" and "[a] case that requires a definitive determination of the law on the facts alleged for the adjudication of an actual dispute, and not merely a hypothetical, theoretical, or speculative legal issue").

rule_1_6/ (obtained July 9, 2021) (in context of third party alleging that client and attorney had colluded to defraud the party, "[t]he lawyer's right to respond arises when an assertion of such complicity has been made").

There are policy considerations that give us pause before so concluding, however. As suggested previously, the self-defense exception of RPC 1.6(b)(4) is not limited to client confidences that are merely embarrassing. If the exception applies, it also allows the attorney to breach the attorney-client privilege. *See* RPC 1.6(a). The exception also is not limited to circumstances in which the opposing party is the client, whose actions might be considered a waiver of confidentiality; the exception also appears to reach accusations of wrongdoing by third parties.[5] Even in disputes between the client and the attorney, the exception is not limited to situations in which the client initiates the conflict; the text contemplates that the attorney may initiate the controversy and reveal client confidences in order to establish a "claim" (*e.g.*, an action for fees). There may be good reason to limit the self-defense exception to formal legal proceedings so that the issue can first be submitted to a judge or other referee, rather than leave the decision to an attorney's self-interested considerations regarding whether to breach the attorney-client privilege. *See* Levine, 5 Hofstra L Rev at 822-23 (so suggesting).

In this case, however, we need not resolve that question. As we will explain, even assuming for purposes of argument that there was a "controversy" between respondent and client within the meaning of RPC 1.6(b)(4), we conclude that respondent revealed information that he did not "reasonably believe[] necessary" for him to establish his claim or defense. We turn to that question.

2. *"Reasonably Believes Necessary"*

The next question is whether respondent reasonably believed it was necessary for him to disclose the information

---

[5] ABA *Model Rules of Professional Conduct*, Rule 1.6 comment 10 (stating that attorney may reveal client confidences to respond to "a wrong alleged by a third person, for example, a person claiming to have been defrauded by the lawyer and client acting together").

to establish a claim or defense. Our inquiry consists of two parts: "necessary" and "reasonably believes."

"Necessary" is not a defined term, so we refer to its general meaning. The relevant definition of "necessary" appears to be:

> "that cannot be done without : that must be done or had : absolutely required : ESSENTIAL, INDISPENSABLE <food is ~ for all> <was ~ to her peace of mind> <the ~ secrecy of my trip—F.D. Roosevelt> <the ~ conditions of freedom—F.C. Neff> <a ~ tool> <a ~ law> <took all ~ steps> <a ~ act>."

*Webster's* at 1511.

Whether the disclosure is "necessary" is not an entirely objective standard, but it does have an objective component, because the attorney must be reasonable in his or her belief that the disclosure was necessary. The term "reasonably believes" is defined in the Rules of Professional Conduct as follows:

> "'Reasonable belief' or 'reasonably believes' when used in reference to a lawyer denotes that the lawyer believes the matter in question and that the circumstances are such that the belief is reasonable."

RPC 1.0(l). The attorney's belief about the necessity of the disclosure must thus be objectively reasonable. A reasonable belief, in the context of attorney discipline, cannot be based on speculation. *See Huffman*, 328 Or at 578 (interpreting different provision of prior disciplinary rules; when attorney "did not know whether [his former client's] bankruptcy petition was false or incomplete," attorney could have "no reasonable belief that [the former client] had committed a crime").

As applied here, the question is whether the circumstances were such that it was objectively reasonable for respondent to believe that disclosing client's full name and specific criminal convictions was necessary (*e.g.*, essential or indispensable) for him to establish a claim or defense to client's allegations.

Respondent argues that client's reviews contained falsehoods,[6] and that he was reasonable in believing that it was "necessary" to respond to those falsehoods with client's full name and specific criminal convictions.

As relevant here, respondent contends that client's reviews were false in asserting that client was not deportable with the charges that he had. Respondent responded to that assertion by contending that client had been deportable with those charges, *under the law as it existed when client had hired respondent*.[7] Respondent explained that he was able to keep client in the country until the law changed, at least arguably, in client's favor. He added that the position taken by client's second attorney, Levin, was never adjudicated in court.

This case offers no opportunity for us to adjudicate the truth or falsity of client's statements in the reviews. The state of immigration law between 2010 and 2015 is not before us. For purposes of this opinion, we will assume that respondent's assertions are correct, and that the reviews were false in the ways that respondent pointed out in his responses. We consider, then, whether the two categories of

---

[6] Respondent specifically and repeatedly asserts that the reviews were defamatory. The claim of defamation is conclusory; respondent does not address either the elements of defamation or the boundaries placed on that tort by the state and federal constitutional guarantees of free speech. *See Neumann v. Liles*, 358 Or 706, 369 P3d 1117 (2016) (addressing defamation claim in context of online review of wedding planner that asserted that planner was "crooked").

We have serious reservations as to whether respondent is correct in his claim of defamation, particularly with what seems to be the assertion that client could defame respondent by disagreeing with respondent's legal assessment of whether particular charges supported deportation. We have, however, no briefing on defamation, as neither the trial panel nor the Bar challenged the allegation.

To avoid suggesting that we have placed any imprimatur on certain types of statements being defamatory, while giving full consideration to respondent's self-defense claim, we will address the reasonable belief of necessity in light of the assertions in the reviews that respondent alleges are false.

[7] Respondent's presentation of the issue to this court is not as nuanced as his actual responses to the reviews. Respondent now maintains that client's assertion was absolutely wrong as a matter of law. He no longer admits that the law changed in any way relevant to whether client was deportable.

We conclude that respondent's claim of reasonable necessity should be evaluated in light of his actual responses to the reviews.

confidential information revealed by respondent were such that he "reasonably believe[d it] necessary" to disclose them to establish a defense to client's assertions.

The first category of information revealed by respondent was the information that client had been convicted of specifically identified offenses. We consider the question a close one, at least as to the Yelp and Google reviews where client was not identified. On the whole, however, we agree with respondent that the disclosure was within the boundary of information that he reasonably believed was necessary to respond to the review. Client had asserted that he was not deportable with the charges against him. That raised the issue whether those charges, in fact, made client deportable. Respondent revealed that information in response to the Yelp and Google reviews (to the extent that the latter is part of the record) at least arguably to explain to the audience the grounds the government had asserted for deportation—conviction of a crime involving moral turpitude—and whether client's crimes constituted such a crime. We agree that respondent could have reasonably believed it necessary to include that information in the responses.

Respondent's response to the Avvo review is a different matter. Here, respondent revealed not only client's criminal convictions, but his full name. That changes the matter substantially. By posting client's name together with the details of client's criminal history, respondent revealed client's identity and his convictions, not just to those persons who sought out these particular reviews, but also to other members of the public as well. Internet search engines would make client's identity available to a much larger audience. Now anyone who searched for client's name in an internet search engine, for any reason whatsoever, could uncover the details of client's criminal convictions.

We are not persuaded by respondent's explanation for why he "needed" to disclose client's name. He asserts that he needed to do so to allow the public to "check" the accuracy of client's representations and respondent's responses. He argues that doing so "ma[d]e it possible for individuals who

read the review and [respondent]'s response to determine for themselves what was, or was not, the truth."

We disagree. Respondent speculates that the public could use client's name "to assess the credibility of the review by, for example, reading other reviews by, or googling, [client]." Respondent does not explain how online readers would use client's name in particular to obtain any information that would be useful to them. Respondent had already revealed the details of client's criminal convictions, so online readers would not need to search for that.[8]

We therefore conclude that respondent was not objectively reasonable in his belief that it necessary to reveal client's name in the Avvo review. By revealing client's name, respondent violated RPC 1.6(a), and he would not qualify for any self-defense exception under RPC 1.6(b)(4).

E.   *Free Speech Issues*

Respondent further argues that any finding of a violation of RPC 1.6 based on the facts of his case is a violation of his right to free speech under both the state and federal constitutions. *See* Or Const, Art I, § 8 ("No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."); US Const, Amend 1 ("Congress shall make no law *** abridging the freedom of speech[.]").

We decline to reach either question. Free speech issues, whether state or federal, are complex. Respondent's arguments on the issue are made only in passing and are insufficiently developed. Between the complexity of the issues, the lack of analysis by the parties, and the broad applicability of free speech rights to all citizens of the state, we would not serve the bench, bar, or public by rendering a decision on these questions.

---

[8] The suggestion that "googling" client would uncover anything relevant to the credibility of the review is entirely speculative.

The record offers no basis to conclude that client posted any reviews under his actual name. To the contrary, the available record contains three reviews posted by client, all of which were posted only under the name "Yarik P" or "yarik." "Googling" client's real name thus would not have uncovered any reviews, and respondent could not reasonably have believed otherwise.

### F.  *Sanction*

We therefore turn to the appropriate sanction that should be imposed in this case.

We recently summarized our method for determining the appropriate sanction for a violation of the Rules of Professional Conduct in *In re Nisley*, 365 Or 793, 453 P3d 529 (2019):

> "In determining the appropriate sanction, we refer to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards), for guidance. We first identify the duty violated, respondent's mental state, and the injury caused. We next assess the appropriate preliminary sanction and determine whether aggravating or mitigating circumstances affect our preliminary assessment. Finally, we evaluate applicable case law."

*Id*. at 815 (citations omitted).

### 1.  *Duty Breached*

We have concluded that respondent violated the duty to protect client confidences prescribed by RPC 1.6 when he revealed client's full name in response to one of the negative reviews.

### 2.  *Mental State*

The trial panel here concluded that respondent acted intentionally. Respondent asserts that he acted negligently.

For purposes of attorney discipline, the mental states are defined as follows:

> "'Intent' is the conscious objective or purpose to accomplish a particular result.

> "'Knowledge' is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.

> "'Negligence' is the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation."

ABA Standards at 7.

Because of the difficulty in determining how to classify respondent's mental state here, we believe it may be useful to discuss what this court has said about how an attorney's subjective understanding of law and fact may relate to the attorney's mental state.

In the context of "knowledge," we have explained that that mental state does not require an attorney's subjective awareness that he or she is violating a rule of professional conduct. *See In re Schenck*, 345 Or 350, 369, 194 P3d 804 (2008), *modified and adh'd to on recons*, 345 Or 652, 202 P3d 165 (2009) ("We reject the accused's argument that, to be a knowing violation, an accused must be aware that his conduct violates a disciplinary rule."). "Knowledge" does require, however, that the accused be aware of the relevant facts. *Id*. ("[T]he accused must know the essential facts that give rise to the violation.").

In *In re Maurer*, 364 Or 190, 431 P3d 410 (2018), this court held that a lack of subjective awareness of the law could affect the proper mental state. The attorney there had been charged with representing a person in connection with a matter in which the lawyer had participated personally and substantially as a judge without obtaining informed written consent of all parties (RPC 1.12(a)). More specifically, the attorney had been charged with representing one party in a contempt proceeding that was based on a marital dissolution judgment that the attorney had previously entered when serving as a trial court judge. We explained that the attorney had acted only with "knowledge," not "intent," because the attorney knew the facts but had had a mistaken subjective belief as to the law:

> "[R]espondent had a conscious awareness of the nature and attendant circumstances of the facts constituting his misconduct. However, because respondent believed that the contempt proceeding was not the same 'matter' as the dissolution proceeding, he lacked the conscious objective or purpose to accomplish a particular result."

364 Or at 202.

Negligence involves the absence of subjective knowledge of facts, under circumstances in which the attorney should have known something. In *In re Klemp*, 363 Or 62,

418 P3d 733 (2018), this court held that an attorney had acted negligently when the attorney had improperly communicated with an unrepresented person:

> "Although we have found clear and convincing evidence that [the attorney] *should have known* that Wells mistakenly believed that [the attorney] was working for her as well as for Andrach, and that [the attorney] should have corrected that mistaken belief, we have not found that [the attorney] did in fact know of Wells's confusion. Accordingly, we conclude that, in failing to make reasonable efforts to correct Wells's misunderstanding, [the attorney] acted negligently and not knowingly."

*Id*. at 101 (emphasis in original).

It is difficult to classify respondent's mental state here. We are mindful that respondent is correct in his assertion that client's name was a matter of public record. Respondent also repeatedly testified that he subjectively believed that client had already revealed his identity by posting the reviews using a shortened version of his uncommon first name ("yarik" or "Yarik P"), together with his city of residence. That belief was not objectively reasonable, for the reasons we have explained. But respondent may nevertheless have subjectively believed it was the case.

Additional confusion may be introduced by the existing limits on the attorney-client privilege. It is true that this case does not involve that privilege, but it is worth noting that a client's identity is not ordinarily considered privileged information, at least not in the absence of unusual circumstances. *See Crimson Trace Corp. v. Davis Wright Tremaine LLP*, 355 Or 476, 500, 326 P3d 1181 (2014) ("'The name or identity of the client was not the confidence which the privilege was designed to protect.'" (Quoting *In re Illidge*, 162 Or 393, 405, 91 P2d 1100 (1939).)); *Cole v. Johnson*, 103 Or 319, 333-34, 205 P 282 (1922) ("Although there may be situations produced by peculiar circumstances where the attorney ought not to be compelled to divulge the name of his client *** , yet no such peculiar circumstances are present here, and it was competent for the attorney to reveal the name of his client[.]"); *Little v. Dept. of Justice*, 130 Or App 668,

674, 883 P2d 272, *rev den*, 320 Or 492 (1994) ("[u]nder the common law, absent peculiar circumstances, the attorney-client privilege did not shield the identities of clients," and codification of attorney-client privilege in OEC 503 was not intended to change that). Thus, while we agree with the Bar that respondent disclosed nonprivileged "information relating to the representation of a client," the law regarding attorney-client privilege itself could cloud the issue in the mind of an attorney analyzing what he or she could do.

Overall, the mental state here presents a close case. Under all the circumstances, however, and in light of the requirement of proof by clear and convincing evidence, we conclude that respondent's mental state was knowing. Respondent had a conscious awareness of the nature and attendant circumstances of the facts constituting his misconduct, and thus he was not simply negligent. Because respondent subjectively believed that client had already revealed his identity, however, we cannot find that respondent acted with intent (*i.e.*, we cannot conclude that he had a conscious objective or purpose to accomplish a particular result).

### 3. *Injury*

We next consider the extent of actual or potential injury. *See* ABA Standard 3.0(c). We agree with the trial panel that respondent did cause injury:

> "Respondent caused actual harm to his client by exposing him to embarrassment for making a public criticism of respondent's work and reputation. Respondent's conduct also caused potential harm to the profession by ignoring the commitment to confidentiality that the public expects from attorneys."

### 4. *Preliminary Sanction*

We turn to the preliminary sanction for failing to maintain a client's confidences. *See Nisley*, 365 Or at 815-16. Given our conclusion that respondent's mental state was knowing and that he caused harm to client and the profession, the presumptive sanction is a suspension. *See* ABA Standard 4.22 (so stating).

5.   *Aggravating and Mitigating Circumstances.*

The parties agree that respondent has three mitigating factors. He has no history of prior discipline, ABA Standard 9.32(a); he made full and free disclosure to the Disciplinary Board and had a cooperative attitude toward the proceedings, ABA Standard 9.32(e); and he has good character and reputation, ABA Standard 9.32(g).

The parties also agree that respondent has at least one aggravating factor: substantial experience in the practice of law, ABA Standard 9.22(i).

The Bar asserts, and the trial panel found, that respondent had two additional aggravating factors: a dishonest or selfish motive, ABA Standard 9.22(b), and a refusal to acknowledge wrongful nature of conduct, ABA Standard 9.22(g). Respondent disputes both contentions.

We agree with the Bar and the trial panel that respondent acted with a selfish motive. We find unpersuasive respondent's contention that his only interest was to protect his own reputation, not to disparage client.

In light of the nature of the disclosure, the changing nature of social media and marketing, and respondent's voluntary act of removing his responses, however, we agree with respondent that his arguments do not qualify as a refusal to acknowledge the wrongful nature of his conduct. *See In re Davenport*, 334 Or 298, 321, 49 P3d 91, *modified and adh'd to on recons*, 335 Or 67, 57 P3d 897 (2002) ("Every lawyer should have the opportunity to defend against accusations respecting his or her personal character and professional responsibility without reprisal for doing so.").

6.   *Case Law*

The trial panel also relied on two decisions by this court to conclude that it was appropriate to suspend respondent: *In re Lackey*, 333 Or 215, 37 P3d 172 (2002), and *Huffman*, 328 Or 567. The Bar relies on the same two cases.

We conclude that they are distinguishable, because both involved a mental state of intent rather than knowledge. In *Lackey*, the attorney had previously prepared an audit memorandum for his superiors containing his recommendations

as an attorney. 333 Or at 220. The attorney did not dispute that the memorandum "contained client confidences and secrets." *Id*. at 225. When the attorney's superiors failed to take what the attorney considered to be appropriate action, the attorney released his memorandum to the press. *Id*. at 220-21. The attorney had acted with intent, for which the presumptive sanction was disbarment. *Id*. at 229. Nevertheless, after a weighing of the aggravating and mitigating factors, this court instead suspended attorney for one year. *Id*. at 230.

Similarly, in *Huffman*, an attorney had written to a former client's new attorney. That letter violated a different disciplinary rule because the attorney had intended it to convey a threat to press criminal charges in order to obtain an advantage in a civil case. 328 Or at 576-78. Moreover, that letter also disclosed client secrets:

> "Each of the statements in the letter on which the Bar relies disclosed arguably criminal or fraudulent actions by [the former client]. The nature of the disclosures, the overall tone of the letter, and the circumstances surrounding its preparation lead us to conclude that the accused's purpose in sending the letter, at least in part, was to embarrass [the client] and to portray him as a criminal or a cheat in order to induce [the new attorney] to question [the client's] character and to refrain from pursuing [the client's] claims."

*Id*. at 581. This court found "that the accused [attorney] intentionally revealed client secrets and threatened criminal charges to obtain advantage in a civil matter." *Id*. at 588. Based on the intentional violation of rules that injured both the former client and the justice system, *id*., and despite the presumptive sanction being disbarment, *id*. at 590, the court suspended the accused for two years, *id*. at 592.

7. *Application*

As we have noted, the presumptive sanction here is a suspension. In light of the difficult issues presented in this case—one of first impression before this court—and the aggravating and mitigating factors, we conclude that such a result would be too harsh. We hold that respondent should be publicly reprimanded.

Respondent is publicly reprimanded.